#4

15AB   fee paid

**FILED**

OCT 2 7 2017

## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

REJEANA SILLA,
    Plaintiff,

CIVIL ACTION No.: 17-1393

**CIVIL ACTION COMPLAINT**

    Vs.

ONE THREE FIVE, INC. d/b/a
BLUSH, and ALBERT BORTZ,
    Defendants.

**JURY TRIAL DEMANDED**

ReJeana Silla
430 Taylor St.
Pittsburgh, PA 15224
(412) 694-3806

## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REJEANA SILLA,
     Plaintiff,

     Vs.

ONE THREE FIVE, INC d/b/a
BLUSH, and ALBERT BORTZ,
     Defendants.

CIVIL ACTION No.:


**CIVIL ACTION COMPLAINT**


**JURY TRIAL DEMANDED**


## COMPLAINT

AND NOW, Plaintiff ReJeana Silla, an individual, brings this lawsuit and files the following Complaint against the Defendants, ONE THREE FIVE, INC. d/b/a BLUSH and ALBERT BORTZ and alleges the following:

1. Plaintiff, ReJeana Silla, is an adult individual residing at 430 Taylor St., Allegheny County, Pittsburgh, PA 15224.

## DEFENDANTS

2. Defendant, ONE THREE FIVE, INC. is a Pennsylvania corporation incorporated under the laws of the State of Pennsylvania, with a principal business address and is doing business at 135 9th Street, Allegheny County, Pittsburgh, Pennsylvania 15222 and operates an adult nightclub under the name "Blush." At all relevant times, upon information and belief, Blush's annual gross volume of sales made was not less than $1,000,000.00

3. Defendant, ALBERT BORTZ owns and operates the corporation that owns the property and building on and which Blush operates.

## JURISDICTION

4. This court has original jurisdiction over this matter pursuant to 28 U.S.C.A. §§ 1343, 1331 as it is a civil rights action arising under the laws of the United States. Plaintiff is alleging violations of her rights under Title I of the Americans with Disabilities Act, 42 U.S.C.A, §§12101 et seq. (the "ADA").

5. This court has jurisdiction of the claim herein pursuant to 28 USC §§1331 and 1343(4). This civil action arises under the Constitution and laws of the United States. Plaintiff is alleging violations of her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 USC §§2000e *et seq.*

6. This Court also has subject matter jurisdiction over this matter pursuant to 28.U.S.C. §201 *et seq.*

7. Further, this Court also has supplemental jurisdiction over Plaintiff state law claims pursuant to 28 U.S.C § 1367 because those claims derive from a common nucleus of operative facts.

## PROCEDURAL REQUIREMENTS

8. On or about April 19, 2016, Plaintiff filed a charge of discrimination against Defendant, satisfying the requirements of the Equal Employment Opportunity Commission. Such charge was filed within one hundred eighty (180) days after the alleged unlawful employment practice occurred.

9. On or about July 31, 2017, less than ninety (90) days prior to the filing of this complaint, the Equal Opportunity Commission issued to Plaintiff a Notice of Right to Sue with respect to such charges of discrimination, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), and the Genetic Information Nondiscrimination Act (GINA)

10. The incidents described in part below were part of a continuing series of incidents of harassment and other allegations which began on or about 2005 and which constitute a continuing violation of the plaintiff's Title VII rights.

## FACTUAL BACKGROUND RELEVANT TO ALL CLAIMS

11. Plaintiff was hired as a dancer in 2005 at the age of 18 by the Defendants, ALBERT BORTZ and ONE THREE FIVE INC., d/b/a "Blush", formerly known as "Club Elite" and located in Pittsburgh, Pennsylvania.

12. In the ten plus years working for the Defendant, the Plaintiff built her dancing career over the years. In addition to working for the Defendant, dancing in Pittsburgh, the Plaintiff also added to her dancing career by traveling throughout the country with other Blush dancers and worked at many different clubs all still while being employed by the Defendant.

13. Many dancers also travel to dance at Blush and also dance at other gentleman's clubs.

14. In addition to being hired as a dancer, the Plaintiff also worked for the Defendant promoting for the club without pay for hours at a time at different events that were scheduled by the Defendant.

15. Plaintiff also worked an average of 4-6 days a week for the Defendant sometimes working double shifts. Plaintiff was required to make and work a weekly schedule that was made by the Defendant.

16. At times working for the Defendant, Plaintiff would sometimes work an excess of 12 hour days and 40 hour weeks. In the ten years plus working for the Defendant, the Plaintiff made the Defendant an extremely significant amount of money from liquor sales, champagne rooms, lap dances, club admission from customers, house fees, late fees and fines, ten percent of credit card profits and additional income made by the Plaintiff that was improperly paid to the Defendant over the years.

17. The Plaintiff was required to schedule a minimum of three days and one day shift per week.

18. Shifts that the dancers are scheduled to work, require the dancers to work a minimum number of 7 hours a day by the Defendant.

19. In addition to the required schedule, dancers are charged fines and late fees for calling off work or showing up late to work.

20. In addition to the fines and late fees, dancers are required to pay house fees, DJ fees and other tip outs. Defendants profit a portion of the income from the dancers made from lap dances and champagne rooms which is set by the Defendant. The prices charged by the club for the rooms and dances are also made by the Defendants, ONE THREE FIVE INC., and ALBERT BORTZ.

21. In addition to the profits from lap dances, champagne rooms and fees paid to the Defendants by the dancers, the defendants also profit twenty percent on all credit card transactions earned by the dancers. The dancers pay the Defendants 10 percent of their earned "Blush money". "Blush money" aka "blue money" is the name for the club printed money which is obtained from all customer credit card transactions. This profit that is made by the defendant charging the dancers 10 percent of their earned credit card tips is also made in addition to the ten percent initially charged to the customers for the credit card card transaction. Therefore, the Defendants are making an additional 20 percent on all credit card transactions earned by the dancers in addition to the profits earned from lap dances and champagne rooms that they collect.

22. The Defendant significantly controls and directs the manner in which a dancer's work is to be performed. Dancers are integral parts of the Defendant's business. Blush's primary attraction and main source of revenue is it's dancers, and without them it would not be a gentleman's club.

23. There is an extensive list of club rules and requirements of the dancers to be performed during these shifts. Additionally, a dress code is strictly enforced and required for the dancers of Blush. Expensive gowns and other required outfits and accessories are required for the dancers to purchase to wear during their shifts. These dresses are available for purchase in the house store also owned and operated by Defendant, Albert Bortz and his wife, Sabrina Bortz. They also control as much as to how much makeup the dancers are required to wear.

24. Plaintiff endured suffering from a number of incidents where she was a victim of malicious acts and crimes against her that were caused by individuals who were also employed by the Defendant. The Plaintiff was a victim of mental and physical abuse by multiple individuals who were employees of the Defendant.

25. Additionally, Plaintiff started her dancing career when she was 18 working for Defendant. The acts alleged in this complaint also ruined her ability to be able to dance at other clubs and prevented future income at other clubs. Plaintiff was exposed to defamation, embarrassment humiliation and PTSD from these events.

26. Plaintiff alleges allegations in this complaint that show she was subjected to invasion of privacy, discrimination, sexual harassment and other allegations by Defendants, ONE THREE FIVE INC., and ALBERT BORTZ.

27. The allegations in this complaint show that the Plaintiff was a victim of harassment, sexual harassment, slander, sabotage, battery, discrimination and hate crimes by individual employees of defendant for an ongoing period of time.

28. On March 14, 2015 Plaintiff was suspended for six months by Defendant's general manager, Mike Baggs after Plaintiff called off work. That was not a normal suspension, Plaintiff was initially only supposed to be suspended for a week. Plaintiff was sexually harassed and verbally harassed severely by two separate female dancers from Blush after the Plaintiff was out with them and other dancers earlier in the day for the St. Patrick's Day parade. Later in the evening one of the female dancers had the plaintiff come over to her house where both females, who by stage names, Dominique and Tessa severely harassed her, made accusations up about her, and told the Plaintiff she wasn't ever getting her job back and ended up making the Plaintiff leave very early in the morning after having her come to her house then once she arrived had questioned why she was there.

29. A few weeks later during Plaintiff's birthday, the same dancers mentioned in the above paragraph had harassed the Plaintiff again regarding her birthday, sexually harassed the Plaintiff by making accusations up on her and also harassed the Plaintiff about her job suspension that occurred on March 14, 2015.

30. Additionally, the Defendant's general manager, Mike Baggs would continually discuss the status of Plaintiff's job with other employees and customers.

31. In May, 2015, Plaintiff was a victim of slander and harassment by another employee of the Defendant after one of Plaintiff's work trips to New York. Additionally, rumors were spread by this dancer, Dallas after the trip, who accused the Plaintiff of over drafting her debit card and Plaintiff was also falsely accused of owing her money weeks after the trip. Plaintiff was also not allowed to attend a social event at the club during her suspension after they returned from the trip to NYC. The dancer also made up false allegations and embarrassing rumors regarding the Plaintiff to other dancers after the trip.

32. Then in June, 2015, the same dancer mentioned in the above paragraph and additional dancers who were employees for the Defendant intentionally and maliciously sabotaged Plaintiff's trip to Las Vegas. The Plaintiff traveled with another dancer after planning and scheduling a work trip to dance in Vegas together with another dancer who lived and worked both in Pittsburgh and Vegas. During the trip, the Plaintiff was a victim of slander, defamation, sexual harassment, battery and was left stranded while out in Las Vegas for almost two weeks by herself. Plaintiff had water dumped on her by the dancer she traveled with while she was sleeping in her bed in the hotel room. The dancer mentioned in the above paragraph 31 did not travel to Vegas with the Plaintiff, but instead spread false rumors about the Plaintiff to the other dancers while they were in Vegas. After the water was dumped on the Plaintiff and she left the hotel room, Plaintiff was deleted and blocked on social media by these individuals. The dancer Dallas, joined in on social media posts with these dancers who were writing

sexually degrading comments regarding Plaintiff, posting pictures of the Plaintiff and making crude comments regarding her weight and other features and also wrote that the Plaintiff was not going to be hired at her club or anywhere out there after the trip was pre planned with this dancer. Additionally, Plaintiff endured continual harassment once returning home after the trip from Las Vegas.

33. On or about October 15, 2015, Plaintiff was jumped at an after-hours club. The battery was initiated by the same dancer above in paragraph 31. Plaintiff was punched in the head multiple times.

34. In November, 2015, Plaintiff suffered from a stress-induced psychotic break.

35. On November 20, 2015, Plaintiff was sexually assaulted in her sleep while she was sleeping at the time at a friend's house who is also a dancer at Blush. ¶ 28

36. The following day on November 21, 2015, the Plaintiff was at work at Blush and started to suffer from mild delusions and extreme anxiety while working. In addition to the anxiety Plaintiff was already having, she was also pranked by a group of individuals at Blush. There was no maliciousness in this prank that occurred, yet the Plaintiff did develop more delusions through the evening. Plaintiff informed the general manager at this time of how she was feeling, and he told her not to worry about it and she shouldn't be concerned with any of that. Plaintiff returned home after work that evening.

37. The following day on November 22, 2015, Plaintiff was driven to Blush Gentleman's Club by a previous front desk employee for the Defendant, ONE THREE FIVE INC., after she had called him for a ride in the morning and he had errands to run before he took her to the club. Plaintiff was in a severe delusional state when she was picked up by this individual and the condition progressed more once Plaintiff was finally driven to Blush. After he had driven her to Blush, he sat with a friend of his drinking at the club for hours, while the Plaintiff was on her own at the club. While at Blush, she was in a state of mental impairment and was accused of being on drugs by the club's general manager because her pupils were extremely dilated. Plaintiff informed him that she wasn't and that she had not taken any drugs and did not drink any alcohol. He still did not believe her and kept saying she was because of how her eyes looked. He should have been aware that something was not right, because she just had a conversation with him at work the night before where she told him she wasn't feeling right and was starting to have symptoms of anxiety, instead he had just ignored anything she was telling him. Plaintiff was later tested at the hospital and no drugs and alcohol were found in her system. Additionally, Plaintiff had asked the general manager to call the owner or the police, instead, he had forced the Plaintiff to leave with the Defendant's former employee who is referred to at the beginning of this paragraph. The Plaintiff told the general manager that she did

not want to leave with him and his friend who she did not know and he informed
the individual and his friend, who had been drinking at the club to take the
Plaintiff out of the club.

38. Once the Plaintiff left with the individual mentioned above, the illness of her
medical condition and mental state severely progressed and she was taken
advantage of by sexual assault and battery and other emotional trauma and neglect
by the Defendant's former front desk employee. The incident has very disturbing
details of mental abuse that occurred. By the time the Plaintiff was hospitalized
the following day, her condition was diagnosed at the hospital at the time as
severely mentally disabled.

39. A day later on or about November 23, 2015, the Plaintiff was returned back to the
club by the individual mentioned above after he had kept taking her to various
disturbing places over 24 hours where the delusions had progressed into severe
hallucinations. Once the Plaintiff was returned to the club by the individual he did
not come back into the club. The Plaintiff went upstairs to the dressing room,
where in addition to the delusions and hallucinations she was having, she was also
then suffering from a physical impairment where her body started twitching and
the Pittsburgh Police were called to the club during this incident.

40. When the police arrived, Plaintiff informed them of irrational beliefs and ideas
she was having and unstable ideas she had and places she was going to go. The
police didn't take the Plaintiff's condition seriously and she had left the club.
About a half hour later, Plaintiff was at a local restaurant two blocks from the
club where the severe delusions kept occurring. The Pittsburgh Police were called
once again and she told them the story of the incident that occurred. She was
clearly under a severely impaired mental state at the time and they didn't do
anything about the situation. The plaintiff endured more dangerous situations
such as almost getting hit by traffic and cars.

41. Later that evening Plaintiff was admitted to Western Psychiatric Hospital where
she was admitted for almost two weeks during the holiday season.

42. While Plaintiff was in the hospital she was visited by Defendant, Albert Bortz's
wife, Sabrina Bortz. Plaintiff had signed a release for them to have the records
from her drug test and to be able to discuss her medical information with the
hospital.

43. After Plaintiff was released from the hospital she had went back to work at the
club. After being at work started to become overwhelming for many different
reasons, including comments made by the general manager and other employees,
the Plaintiff decided to take a break from the club. Albert informed her if she
needed to take a break that was fine. Once the Plaintiff discussed her

hospitalization with Albert Bortz over the phone, she decided to return to work in January, 2016.

44. Additionally, Albert informed the Plaintiff that he wanted authorization signed for release of medical information to them from her therapist and psychiatrist so he could discuss information with them regarding the Plaintiff in order for her to work there.

45. Once the Plaintiff returned to the club, she dealt with harassment, pranks and additional discrimination by other employees of the defendant, and it was admitted by Sabrina Bortz, that they were aware this was occurring. The Plaintiff would become overwhelmed at times while at work when these incidents occurred. Additionally, the general manager told the Plaintiff at those times that she wasn't "trying" to make money like she normally did. Plaintiff informed him that she was just getting overwhelmed with what was happening while she was working.

46. Plaintiff was also called names such as "schizophrenic" because of the incidents that led to her hospitalization by one of the employees while the Plaintiff was at work. ¶ 28

47. While at work specific dancers referred to in this complaint ¶ 28 would tell the Plaintiff that the general manager was calling her crazy and did not want her there. This was said in front of customers while the Plaintiff was working her shift.

48. Additionally, Plaintiff was informed by other dancers, employees and customers not referred to in this Complaint, that the general manager would constantly discuss her job status with them and ridicule the Plaintiff to them regarding her employment. An employer may not discuss these terms of an employee's employment with other individuals.

49. On January 4, 2016, Plaintiff had a drink thrown on her during a New Years party at a night club and was pinched by one of the dancers who was employed by the Defendant. One of the dancers present during this incident is referred to in above paragraphs. ¶ 31

50. In addition to the release of other medical records, Defendant requested records from Plaintiff's psychiatrist and therapist in order for her to work for them. The Plaintiff signed release forms from the medical office at the Primary Health Network to release medical information and permission for Defendant, Albert Bortz and his wife Sabrina Bortz to obtain and discuss Plaintiff's medical records from the office.

51. Plaintiff continued to work for the Defendant and on February 7, 2016, Plaintiff received a phone call from Defendant's general manager, Mike Baggs, while she was at home. He informed her she was being taken off the schedule and Plaintiff was fired at this time. He had called her and told her that he was taking her off the schedule because she was hearing voices. Plaintiff informed him those accusations weren't true and he told her that she was crazy and that they couldn't have her there. He told her that she was in the hospital for hearing voices and they could not have her work there, and when she denied those accusations he said that she was in the hospital for those reasons. The conversation continued to where he had called her crazy again, and he said he was busy and had to go. Plaintiff asked to speak to the club owner and Defendant, Albert Bortz and she was told that he was on vacation and would be back in about a week.

52. Within the few days following Plaintiff's suspension, Defendant had hired back one of the employees who was involved in the incidents above. ¶¶ 31,32

53. Plaintiff called the club about a week later and spoke to Albert Bortz, who informed her that she could not work there anymore. He stated to the Plaintiff that they weren't the crazy ones and told her to go and try to work somewhere else and see what they think. Even though the accusations were not true, the fact is Defendants discriminated because they believed that to be the disability of the Plaintiff, and therefore was the reason for firing her. During the conversation that the Plaintiff had with Defendant, Albert Bortz, she had started crying and informed him the accusations were not true and that the general manager called her while she was at home accused her of hearing voices, and he had also called her crazy. She also informed him that the general manager told her that she could not work there because she was in the hospital, and that the Defendant, Albert Bortz and his wife were already well informed of the hospitalization in November that resulted after the Plaintiff was a victim of multiple assaults. She asked if she could call back in a week or two to talk to him regarding her job and he said no and hung up the phone on her. This led to severe financial and emotional distress, humiliation, and many other things that caused her to suffer. Plaintiff was also harassed by other dancers about the job loss and that she had to struggle financially in addition to being harassed about the medical condition. Plaintiff had went and worked at the Penthouse Club after talking with Defendant, Albert Bortz where multiple attacks and threats had occurred against the Plaintiff.

54. On April 19, 2016, Plaintiff stopped into Blush to personally speak with the owner and management. One of the dancers came into the lobby and informed the Plaintiff that one of the managers, Ryan said she needed to leave and that they did not want her there and that she had to go. This dancer is named above. ¶28 Plaintiff said that she only wanted to speak to him regarding her job and the release she had signed at the therapist office for them because plaintiff was

informed by the owner, Albert Bortz and his wife Sabrina Bortz that they wanted a release from her psychiatrist office.

55. On April 19, 2016, Plaintiff filed an initial complaint with the Pennsylvania Human Relations Commission.

56. A formal complaint of discrimination was filed against the Defendant with the EEOC and Pennsylvania Human Relation Commission on July 6, 2016. The Commission encourages both parties to consider negotiating a settlement prior to a Commonwealth determination on the merits of the Complaint. Plaintiff was informed that the fact finding conference that was scheduled on December, 8 2016 was cancelled and then Plaintiff was later informed that Defendant still decided to attend without her being notified.

57. While the stress continued because of harassment and assaults that occurred, so did Plaintiff's anxiety and depression. On March 31, 2016, Plaintiff had gone to the emergency room after being bit by a dog on her leg. Plaintiff's stress and anxiety caused her to react scared to the dog in a way that caused the dog to attack her.

58. On May 8, 2016 Plaintiff was admitted to Allegheny Valley hospital psych unit for three days after being the victim to another battery after being hit by multiple female individuals where she was diagnosed with depression.

59. On July 17, 2016, Plaintiff had spoke with Defendant, Albert Bortz after seeing him while she was at local club in downtown Pittsburgh. Plaintiff had not gone to many social events except New Years since her hospitalization in November 2015. ¶ 49

60. Albert had spoke with the Plaintiff regarding the multiple incidents that happened to her while she was working at the Penthouse Club. Plaintiff had informed the Defendant that she had been sexually harassed and assaulted in addition to a list of other degrading things that happened to her while at the club. She also told him about one of the incidents where there was food and sexual defamatory signs written and placed on her while she was sleeping at the club, and that there were photos taken of her with these signs on her by management and a dancer at the Penthouse club. She informed him that the photos were used as blackmail and later posted on the Plaintiff's social media account by the dancer who is also a dancer at Blush. They also talked about an assault incident that occurred at Penthouse about a week after being fired and talking to Defendant, Albert Bortz. The Plaintiff and him also had talked about her employment at Blush and she also informed the Defendant that she had filed a complaint against Blush and the Penthouse Club with the Human Relations Commission. The Defendant also asked the Plaintiff where she was currently working. She informed him that she

just got a new job bartending at a local bar in Bloomfield and Defendant said he wanted to know because he wanted to send business to her there.

61. On July 19, 2016 Albert's wife, Sabrina contacted the Plaintiff on social media saying that she had seen photos online that the Plaintiff ran into Defendant, Albert Bortz as mentioned in the above paragraph. She told the Plaintiff that she had not seen her in a while and wanted to meet her for lunch, and on July 22, 2016, Plaintiff had met with Sabrina Bortz at a local restaurant in downtown Pittsburgh where they discussed a number of things involving incidents with the Plaintiff and her employment at Blush. The Plaintiff also told her that she had tried to contact her on social media, but she said she did not get any of her messages.

62. Plaintiff received a letter from the Human Relations Commission that was mailed on Dec 7, 2016. The letter informed her that the office received the Respondent's answer to the allegations in the complaint. The Defendant's Answer contained denials to factual allegations by the Plaintiff and also contained false information and allegations about the Plaintiff in the Defendant's New Matter.

63. The Commission informed her that she had the opportunity to rebut the Respondent's answer and to include in her rebuttal any documents, witness statements and/or any documents they should request from the Respondent. They also instructed her to to also provide answers to a list of items mailed from the commission.

64. Plaintiff was given a notice to submit all of this information within fifteen days by December 22, 2016.

65. Plaintiff submitted all of the above that was asked of and also her Rebuttal and Answer to the Defendant's New Matter in addition to Plaintiff's other allegations that are mentioned in this complaint.

66. Plaintiff never received any further response from Defendant regarding Plaintiff's other allegations, Rebuttal or the Plaintiff's Answer to Defendant's New Matter.

67. Since the filing of the complaint against Defendant, Plaintiff struggled with job searches and employment which added severe financial and emotional stress.

68. Additionally, she has suffered with social losses, PTSD and other physical illnesses that required her to see many medical specialists, therapists and other testing done.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF –VIOLATION OF THE ADA, DISCHARGE DISABILITY DISCRIMINATION

66. Plaintiff realleges and incorporates the above paragraphs as if the same has been set forth again herein.

67. To establish a prima facie case under the ADA, a plaintiff must show that: "She is a qualified person within the meaning of the ADA, that she is qualified to perform the essential functions of the job (either with or without reasonable accommodation), and that she has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises."

68. An "employer" for ADA purposes is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."

69. On November 24, 2015, Plaintiff was hospitalized and treated for a medical condition at Western Psychiatric Institute and Clinic where she was diagnosed with a disability after suffering from a severe stress induced psychotic break.

70. Plaintiff had returned to work for the Defendant after the hospitalization where she had been harassed on multiple occasions while at work due to the disability and the hospitalization.

71. Additionally, the Defendant's general manager, Mike Baggs would discuss and insult the Plaintiff to other dancers, who later would also harass the Plaintiff regarding her job while at work. Additionally, they would also make these insults to the Plaintiff in front of customers while she was at work.

72. Plaintiff informed Defendant, Albert Bortz on Dec 21, 2015 that she needed a break and that she was going to take a few weeks off. He informed her that was fine.

73. On or about January 24, 2016, Plaintiff went back to work at Blush, where she was still pranked and harassed while at work. Defendant was aware of this and Sabrina Bortz would have conversations with the Plaintiff letting her know that that was continually occurring by dancers and other individuals while she was working.

74. On February 7, 2016, Plaintiff received a phone call from Defendant's general manager, informing her that they couldn't have her work there anymore and he was taking her off of the schedule because of her disability and because she was hospitalized for a disability. She insisted on talking to the owner, Albert Bortz, and he informed her that he was on vacation and would be back within a week.

75. About a week later the Plaintiff called the owner, Albert Bortz. She informed him of the conversation she had with the general manager, and that he had taken her off of the schedule. She also informed Albert that he was making accusations up about her that wasn't true. Albert proceeded to tell her that she couldn't work there. He said, "We aren't the ones that's crazy here why don't you go and try and work somewhere else and see what they think. The Plaintiff then asked if she could please call back in a few weeks and he said no and hung up on her.

76. After the Plaintiff was taken off of the schedule at Blush she went and worked at the Penthouse club where the Plaintiff became a victim of additional assaults and harassment the following week.

77. Additionally, Defendants required release of personal medical information to them regarding the disability and had also required that the Plaintiff seek treatment with a therapist and psychiatrist.

78. Americans with Disabilities, § 12112(d)(4)(A) provides that a covered entity:

> shall not require medical examination of their employees for the purpose of determining whether such employee is an individual with a disability or as to the nature or severity of the disability unless the examination is shown to be job-related and consistent with business necessity

79. No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 USCA § 12112 (a)

80. A covered entity may not participate in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to prohibited discrimination. 42 USCA § 12112(b)(2)

81. Because the Plaintiff is and was a qualified individual with a disability, and because the Defendants terminated the Plaintiff's employment due to her disability, the Defendants have discriminated against the Plaintiff in violation of 42 USCA §12112(a).

## SECOND CLAIM FOR RELIEF- VIOLATION OF THE ADA, EMPLOYMENT DISCRIMINATION FOR HAVING A "RECORD OF" A DISABLITY OR BEING "REGARDED AS DISABLED"

82. Plaintiff realleges and incorporates paragraphs above as if the same has been set forth here in.

83. Although the Plaintiff has suffered from a diagnosed disability and was hospitalized due to a disability, to bring a discrimination claim under the ADA, a plaintiff need not prove that she actually suffers from, or has been diagnosed with, a disability. An employee may state a valid cause of action if she is "regarded" by her employer as having a record of impairment that substantially limits one or more of her major life activities.

84. Defendants intentionally discriminated against Plaintiff in violation of the ADA by its discharge of her, in that it discharged her because it regarded her as disabled and because she had a record of disability.

85. As a direct and proximate result of said intentional and discriminatory conduct, Plaintiff has lost income and other benefits; she has suffered severe emotional distress, humiliation, embarrassment, pain and suffering and loss of enjoyment of life; and she has suffered other losses, all of which will be proven at the trial of this action.

86. Defendants discriminatory conduct exhibited a willful and reckless indifference to Plaintiff's federally protected right to be free from disability discrimination.

## THIRD CLAIM FOR RELIEF-VIOLATION OF THE ADA

87. The Plaintiff realleges and incorporates the above paragraphs as if the same has been set forth here in.

88. By participating in a contractual or other relationship that had the effect of subjecting the plaintiff to prohibited discrimination on the basis of a disability, the defendants have violated 42 USCA § 12112 (b)

## FOURTH CLAIM FOR RELIEF- INVASION OF PRIVACY

89. The Plaintiff realleges and incorporates the above paragraphs as if the same has been set forth here in.

90. The tort of intrusion, sometimes classified under the label" invasion of privacy", represents a judicial effort to define personal spheres or zones that the law states is off limits to others.

91. The key elements of this tort, which may very somewhat from jurisdiction to jurisdiction, include the following 1) intentional conduct that 2) intrudes upon 3) a sphere or zone of privacy in 4) a way that the law sees is especially offensive to the ordinary reasonable person.

92. An important dictum emphasizes that the defendant must be seeking information about the plaintiff "by improperly intrusive means."

93. The basic definition of intention in the intentional torts requires that the defendant intend an act that violated a norm. At an abstract level, the tort protects dignity and personhood.

94. The Defendants, ONE THREE FIVE, INC., and ALBERT BORTZ discriminated against Plaintiff for having undergone a drug treatment program and also for a disability and psychiatric hospitalization that occurred.

95. Plaintiff was required to give permission to Albert and his wife in regards to allowing them to obtain personal medical information and treatment program records in order for her to continue employment.

96. Plaintiff was required to bring in records of completion from the White Deer Run impatient facility in June 2014 and then was required to sign release forms for the Defendant at Greenbriar outpatient facility in 2014 so that he could have permissions to speak with them regarding the Plaintiff. Albert had also required the Plaintiff to bring in copies of her drug test results from the facility.

97. Plaintiff was required to sign release forms at Western Psych in November 2015 for the defendant allowing them to speak with the hospital regarding the Plaintiff and to obtain the results from her drug test. Additionally, Plaintiff was required by the Defendant, Albert Bortz to sign release forms at her therapist and psychiatrist office where she was seen following the hospitalization to allow permission for them to speak with them and obtain personal medical information.

98. The Plaintiff would communicate with Sabrina Bortz regularly regarding the medication she was taking, because she would check frequently with the Plaintiff to make sure she was taking the medication that was prescribed during the hospitalization in November 2015. More stress was also added to the Plaintiff, because she had also kept telling her that her dad needed to be in a home.

99. Plaintiff had given permission to Defendants and signed all release forms regarding her medical records as requested by Defendant, and she was fired in February 2016 due to discriminatory reasons.

## FIFTH CLAIM FOR RELIEF- VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

100. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

101. Under Title VII, a "hostile work environment" is one which is "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive as to alter the Plaintiff's employment and create an abusive working environment."

102. Federal district courts and appellate courts faced with the issue have held that the claim of "hostile work environment" is available to ADA claimants, as it is to plaintiffs under Title VII of the Civil Rights Act of 1964. Keever v. City of Middletown

103. To demonstrate a hostile work environment claim, a plaintiff must show that she was subjected to conduct that unreasonably interfered with her work performance or created an intimidating, hostile, or offensive work environment. The employer must be shown to have engaged in "harassment so severe or pervasive as to alter the conditions of employment and create an abusive working environment."

104. The court, in determining whether a working environment is hostile will examine the frequency and severity of the alleged discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.

105. During the course of Plaintiff's employment, Plaintiff was subjected to sexually suggestive and derogatory comments by Defendant, ONE THREE FIVE, INC.'s employees and other co-workers under Defendant, ALBERT BORTZ and management's supervision.

106. Acts of sexual harassment started years prior to the most recent incidents which occurred in 2016, where Defendant's general manager, Mike Baggs would make inappropriate comments about the Plaintiff to customers and other employees. One of these examples is him calling the Plaintiff derogatory names and making inappropriate comments about her weight to another employee.

107. In addition to the General Manager making constant derogatory statements to other employees and customers regarding Plaintiff, he was continually talking about her employment with other employees as this was an ongoing occurrence.

108. Specifically, on or about March 2015, Plaintiff was subjected to the following acts of sexual harassment: Plaintiff was suspended with an unfair suspension from work after calling off. The initial suspension was only supposed to be a week or two. Later in the evening the day of the St. Patrick's Day parade, the Plaintiff was called by one of the dancers of Blush to come over to her house where she was with another Blush dancer. The Plaintiff was with them earlier in the day. When the Plaintiff arrived to her house she had dealt with an extreme amount of verbal and mental abuse. This included the Plaintiff being called names, accused of sexual acts that were not true, questioned her on why she was there, they ridiculed her for being suspended and said she was never getting her job back, was called a pushover and screamed at in addition toe being told very degrading statements about her own personal relations with other individuals. The Plaintiff was then asked to leave and said her stuff was waiting at the bottom of the steps. These individual dancers are also referenced to in above paragraphs. ¶ 28

109. In May 2015, Plaintiff went on a work trip to New York City with another dancer who works for Defendant, ONE THREE FIVE, INC. After the duration of this trip, the individual had made lies and rumors about the Plaintiff in addition to accusing her of owing money and over drafting a bank account. Additionally, the individual made false embarrassing comments about the Plaintiff at Blush regarding their trip to New York. ¶ 31

110. In June 2015, Plaintiff went on a work trip to Las Vegas, and dancers who were employed by Defendants, ONE THREE FIVE, INC. "Blush" intentionally conspired and sabotaged Plaintiff's work trip planned with these dancers to Vegas. During the trip, Plaintiff had rumors made up about her, water poured on her while she was sleeping by one of the dancers and following that incident she was left alone in Las Vegas for over a week.

111. Additionally, Plaintiff was humiliated and harassed by these individuals mentioned in the paragraph above while she was in Vegas, they made embarrassing comments about the Plaintiff, ridiculed her, posted photos of the Plaintiff and posted defamatory and slanderous statements regarding the Plaintiff on social media during the trip to Las Vegas. One of these dancers from the New York trip, who did not go on the trip to Vegas, had still joined in on posting about the Plaintiff on social media with these other dancers during her Vegas trip. The dancer is referred to in above paragraphs. ¶31

112. Additionally, sexual derogatory statements regarding the Plaintiff were made during this time by these individual dancers. One of these dancers had lived and worked both in Vegas and for Defendant, ONE THREE FIVE, INC. This dancer had arranged for the Plaintiff and another female dancer who is not individually named in this complaint, to travel to Vegas to work with her. Once the Plaintiff arrived in Vegas the following day or two, the Plaintiff had been blocked on social media where the slanderous and humiliating posts and photos regarding the Plaintiff were posted by the female dancer she traveled with and the other dancer referenced to at the beginning of this paragraph and was later blocked by the dancer referenced to in the above paragraph. They also made ridiculing statements regarding the Plaintiff's weight and other body features and the simple fact that they were making sure that she was not going to be hired at the club that the Plaintiff initially intended to work at with the dancer who was currently living in Vegas. The Plaintiff had arranged this trip with this dancer prior to traveling to Vegas. Rumors were started by the individual referenced to in paragraph 31, and led to these dancers to conspire together against the Plaintiff. Plaintiff had previously traveled and danced in Vegas years prior on multiple occasions with other dancers, and during this trip the dancer sabotaged this trip by leaving her stranded by herself in Vegas, the allegations in paragraphs 98-100 and posting on social media that she wasn't getting hired at her club or any club out there.

113. Plaintiff returned to work at Blush again sometime around the month of August 2015 after a six-month suspension that started in March 2015. The suspension had left the Plaintiff working at the Penthouse club.

114. During the time between August 2015 and November 2015, Plaintiff was a victim of multiple assaults and batteries, and then in November 2015, Plaintiff suffered from a stress induced psychotic break. The Plaintiff started becoming overwhelmed one evening while working at Blush, and she had informed the general manager of this. Then just a day later, Plaintiff was assaulted and taken advantage of under this condition by an individual who is a former employee of the Defendants. Plaintiff was taken to Blush by this individual while she was in a delusional state. During that time the individual was drinking at the club.

115. While Plaintiff was at Blush suffering from a mental impairment she asked for the police and club owner, Albert Bortz to be called. Instead of calling the owner, the police, or calling for medical attention for the Plaintiff, general manager, Mike Baggs accused the Plaintiff of being on drugs because her pupils were extremely dilated and had forced the Plaintiff to leave with the individual referenced to in the above paragraph.

116. He had asked the former employee to take Plaintiff out of there and off the premises after she informed him she did not want to leave with them. Plaintiff was having hallucinations and a severe mental impairment at this time and was afraid to leave out

of the building. Eventually after the general manager and the former employee had made her leave the club, Plaintiff had left with the individual.

117. This individual contributed to the delusions that the Plaintiff was having by lying and pretending to be taking the Plaintiff somewhere. The Plaintiff ended up being the victim of a sexual assault with this individual. Plaintiff was driven around to various places where disturbing incidents occurred. Over a day later the Plaintiff was driven back down to Blush by this individual after having her out for almost two days. While at Blush the Plaintiff was in a very bad condition at this point mentally and physically. Plaintiff was suffering from severe delusions and physical twitching and spasms in the body. At this time is when the Pittsburgh Police were called to Blush where they didn't do anything about the situation. ¶40

118. Later in the evening the Plaintiff was taken to Western Psych. In the emergency room at the hospital the Plaintiff was also having a psychotic break regarding sexual assaults in addition to the other delusions.

119. Plaintiff was given a drug test while in the hospital which came back negative for all drugs tested. Plaintiff signed a release of this information to Defendant, ALBERT BORTZ and his wife, Sabrina Bortz, who visited the Plaintiff while she was in the hospital.

120. When the Plaintiff called to return to work after almost spending two weeks in the hospital in November 2015 during the holidays, the Defendant, ALBERT BORTZ wanted a release from the Plaintiff's therapist and psychiatrist that she was scheduled to see.

121. The Plaintiff endured additional harassment after returning to work. The following is a summary of the types of harassment that continued after the Plaintiff returned to work after she was in the hospital.

122. Plaintiff was subject to such harassment substantially on the basis of different forms of hate crimes and on the basis of her disability impairment in addition to sexual harassment.

123. Plaintiff was also pranked at work. Albert's wife, Sabrina Bortz had told the Plaintiff that dancers and other individuals were "messing" with her.

124. The courts have also recognized pranks to be considered a battery tort.

125. Plaintiff did not encourage, welcome, or consent to the harassment described in this Complaint. Additionally, Plaintiff had to keep pushing the individual mentioned above away from her earlier in the evening when he first kept making gestured towards her and trying to kiss her. Later in the evening is when the moves the individual made on

her progressed while she was having hallucinations this individual was misleading and lying to her causing her to believe her delusions she was having.

126. The harassment described in this Complaint had a substantial detrimental effect on on Plaintiff's employment and psychological well-being. This includes harassment prior to and after Plaintiff's hospitalization in November 2015.

127. Additionally, the harassment had caused severe damage to Plaintiff's reputation and other serious damages.

128. Plaintiff gave Defendant notice of harassment described in this Complaint by reporting each of the incidents to all management or to Albert Bortz.

129. Additionally, the Plaintiff gave Defendant, Albert Bortz and other management at Blush notice of the harassment that occurred individually by general manager, Mike Baggs as it was an ongoing occurrence.

130. Plaintiff also reported and complained of harassment that occurred regarding other individuals to Defendant, ONE THREE FIVE, INC., and general manager, Mike Baggs.

131. Defendant, ONE THREE FIVE, INC., had notice of the harassment described because such harassment was pervasive and obvious. Additionally, Plaintiff informed Defendant and its management of the harassment.

132. Defendants, ONE THREE FIVE, INC. AND ALBERT BORTZ, had failed to investigate and take remedial action in response to Plaintiff's complaints.

133. Additionally, Defendants' and management let the forms of harassment continue.

## SIXTH CLAIM FOR RELIEF- VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, QUID PRO QUO SEXUAL HARASSMENT

134. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

135. Plaintiff is a woman and as such is a member of a group protected under Title VII from discrimination on the basis of sex.

136. The following is a summary of sexual advances against Plaintiff by Defendant, ONE THREE FIVE INC., and its supervisors.

137. The dancers of Blush are required by the Defendants to perform all nude on two separate stages throughout the evening. The dancers performing on stage is the main attraction of Defendant's business that generates entertainment for it's customers throughout the evening. The dancers are not paid to perform on stage they earn their money from dancing at the stage by earning tips from the customers. The dancers are required to perform on these stages even when there may be very few customers in the club and no one sitting at the stage. Therefore, the dancers can sometimes be required by Defendant to dance nude on stage for minimal dollars and sometimes nothing at all. Plaintiff complained that she shouldn't have to dance nude when there are no customers tipping at the stage as well as other dancers have also complained of this.

138. The dancers can be fined and sent home or even fired for not following with this club rule.

139. There was an incident where the Plaintiff was performing on stage while another female dancer who is referred to in above paragraphs, was sitting at the stage making comments about the Plaintiff to her while she was dancing after she had got done harassing the Plaintiff about her medical condition after she was hospitalized in November 2015 infront of two other customers. The Plaintiff was then called to dance on stage which she sat at the stage making comments to the Plaintiff as soon as she got on stage. The anxiety and stress after the hospitalization was hard enough then to have to come back and be harassed at work because of it. Additionally, the Plaintiff was publically announced by the club DJ to make sure she was nude for the third song. This type of incident happened on many occasions and with other dancers. ¶¶28, 46

140. In another incident that is alleged in above paragraphs, the Plaintiff was forced to leave the club by the General Manager stated above in paragraph with a male individual who was a previous employee for the club.  ¶¶ 115-117

141. The Plaintiff told the general manager that she did not want to leave with him and that she was afraid to leave the club. The manager accused her of being on drugs and ordered for the male individual to take Plaintiff out of the club. This occurred the evening prior to Plaintiff's hospitalization in November 2015. Later in the evening the Plaintiff was a victim of sexual assault and battery and was taken advantage of and lied to while suffering a mental condition at the time by this individual.

142. Defendant, ONE THREE FIVE, INC., and its general manager acted with malice and with reckless indifference to Plaintiff's civil rights and emotional and physical well being.

## SEVENTH CLAIM FOR WRONGFUL DISCHARGE FROM EMPLOYMENT IN BREACH OF CONTRACT

143. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

144. Plaintiff and Defendants entered into an employment contract under which Plaintiff agreed to be employed as a dancer for Blush and agreed to work a scheduled shift and a set number of days for the Defendants.

145. Plaintiff's initial hiring in 2005 by Defendants for "Club Elite" was the start of Plaintiff's dancing career. Plaintiff was promised to learn the industry by Defendant, ALBERT BORTZ. The club rules, fees and shift requirements for the dancers have changed drastically since the club has been renamed "Blush".

146. At the time the parties entered the contract, Defendants, ONE THREE FIVE INC., and ALBERT BORTZ verbally assured Plaintiff she would have job security.

147. Plaintiff worked exclusively for Blush for indefinite periods of time. Plaintiff anticipated that her employment with Blush would be on an ongoing basis.

148. Defendants have a set of club rules verbally given to the dancers, a dress code required of the dancers, schedule requirements, and additional requirements of the dancers that must be performed while working their shift.

149. Defendants promise that employees would be discharged only for good cause and only if the rules are broken.

150. Plaintiff was aware of the Defendant's policies and rules set out to each of the Defendants' employees, and continued to work for Defendant in reliance on Defendant's promises concerning job security.

151. On or about Feb 7, 2016 Defendant discharged Plaintiff from employment without following termination procedures promised to Plaintiff and with discriminatory causes, thereby breaching the contract of employment.

152. As a result of Defendant's wrongful discharge of plaintiff in breach of the employment contract, Plaintiff has lost earnings, has incurred expenses and losses in seeking other employment.

153. In accepting employment with Defendant, Plaintiff relied on Defendant's promises of job security.

154. Defendant should reasonably have expected Plaintiff to rely on its promises of job security, and is therefore estopped from denying their enforceability.

155. The Plaintiff is entitled to relief for lost earnings and any other incidental expenses occurred while seeking other employment.

## EIGHTH CLAIM FOR RELIEF- FRAUD CLAIM BASED ON FALSE ASSURANCES REGARDING SECURITY

156. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

157. There are five fraud-based causes of action that may arise from a defendant's assurances as to security measures.

158. This claim shows allegations for four of these causes of action, fraud, constructive fraud, misrepresentation and statutes addressing deceptive practices or providing consumer protection.

159. An employee discharged in breach of contract may be able to bring a fraud action based on the employer's promise of job security.

160. To establish a fraud claim, the plaintiff must show that 1) the defendant made a false representation 2) of a material fact 3) with knowledge of its falsity 4) and with intent to induce reliance 5) that did induce reliance by the plaintiff, and 6) resulted in damage to the plaintiff

161. Defendants, ONE THREE FIVE, INC. "Blush" and ALBERT BORTZ made multiple false representations and promises about material facts regarding Plaintiff.

162. Defendant, Albert Bortz assured Plaintiff job security with her employment with ONE THREE FIVE, INC. "BLUSH". Plaintiff was promised job security when she began as a dancer in 2005.

163. Defendant was aware that they were hiring and treating Plaintiff as an employee for almost ten years while charging fines, house fees and illegally taking a portion of the Plaintiff's tips while paying no wages to Plaintiff, having complete control of the dancer's work that is performed and claiming the dancers as independent contractors instead of employees.

164. Plaintiff assumed that by working for an established corporation that these fines, fees and regulations of the club were in accordance with state and federal laws. Plaintiff

was not aware that they were illegally collecting a portion of the tips, working as an employee and being claimed as an independent contractor.

165. A case was brought by dancers in a class action lawsuit against Defendant for these violations, which has been settled. Correll v One Three Five, Inc. 2:13-CV-01610

166. Defendant, Albert Bortz had threatened all remaining dancers who were not part of the lawsuit that their joining in the lawsuit would be the cause of their firing from the club, therefore many dancers were afraid to participate in the lawsuit. Blush employs an average of 80 plus dancers in a given year. Some of these dancers have been employed by Defendant for many years, while some dancers are frequent industry travelers who dance at many clubs. A lot of dancers began working for the Plaintiff at the age of 18 just as the Plaintiff had. Many of those dancers do not know their wage and employment rights.

167. Plaintiff was assured continued job security throughout her employment with Blush. Plaintiff dedicated years of her life working in the industry and working for the Defendant.

168. Plaintiff had undergone a one time impatient and outpatient drug treatment program in 2014. Plaintiff was promised continued job security with her employment at Blush upon completion of the rehab program. Plaintiff was required to show her completion certificate of the impatient rehab and Plaintiff was required by Albert Bortz to sign a release form at her outpatient program at Green Briar for Defendants. Plaintiff continued her outpatient program at Green Briar while working at Blush.

169. Additionally, in a contract action, a particular contract is also invalid by law (called the "statute of frauds") when the contract was a product of duress.

170. The Plaintiff had signed this release of personal and medical information due to these circumstances.

171. She was required to sign the release form so that Defendant, ALBERT BORTZ and his wife could check on the Plaintiff's treatment and to confirm that Plaintiff was continuing treatment successfully. In November 2014, she had also completed the outpatient program after requesting her treatment program be extended on her own in October 2014.

172. Plaintiff and Defendant, Albert Bortz would talk frequently regarding Plaintiff's job as a dancer and her saving money to invest into something for her future.

173. Prior to and after Plaintiff's hospitalization in November 2015, Plaintiff was falsely accused of being on drugs while at work by the general manager.

174. Additionally, Plaintiff's job security was jeopardized by these accusations and by discrimination.

175. Defendant made false allegations regarding Plaintiff.

176. Defendant also jeopardized future employment and Plaintiff's reputation by making false statements to the Human Relations Commission regarding Plaintiff. Additionally, Defendant submitted many false accusations and allegations regarding Plaintiff.

177. Defendant continually discussed personal matters regarding Plaintiff with customers and other employees and dancers. Defendant made false representations regarding Plaintiff during her employment with these individuals by stating information regarding Plaintiff's medical history and other personal matters that invaded Plaintiff's privacy.

178. Defendant also made false assurances by intending for the Plaintiff to sign release forms and requiring her to sign these release forms regarding her private medical information in order for her to work for the Defendant, while later firing her for discriminatory reasons.

179. Defendants, ONE THREE FIVE, INC. and ALBERT BORTZ made discriminatory statements to Plaintiff regarding her employment at Blush and gave discriminatory reasons to Plaintiff as to why they fired her they later denied these allegations.

180. Additionally, Defendant hired Plaintiff with the knowledge that they were violating Federal and state law wage violations. Plaintiff was unaware that Defendant was violating these laws when hiring her as an employee. The claims are set forth below.

## FLSA CLAIMS FOR MINIMUM WAGES, STRAIGHT TIME COMPENSATION, AND OVERTIME PAY

## FACTUAL ALLEGATIONS IN RELATION TO FLSA AND PA STATE LAW

181. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

182. Individuals who seek redress for underpayment of wages are not limited to recover pursuant to FLSA or similar state statutes; party may properly allege breach of

contract in addition to statutory violation even when only difference between benefits provided by contract and those provided by statute is limitations period applicable to claim based on conduct prohibited by both contract and statute ¶¶143-155

29 U.S.C.S. §§201 (15)

183. The crux of the FLSA and Pa State Law, *inter alia,*: (1) that all employees are entitled to be paid minimum wages for all hours worked; (2) that all employees are entitled to premium overtime compensation for all hours worked in excess of 40 hours a week; and (3) that all gratuities earned by an employee are the property of the employee.

184. The exotic dancers remain economically dependent and under the complete control and direction of Defendants, but are paid no wages in connection with that work. The dancers generate the primary revenue for Blush, as they are still required to share the tips and other profits that they earn with Blush Gentleman's Club, and are otherwise treated as employees of Blush in all relevant aspects as before.

185. The totality of the circumstances surrounding the relationship between Defendants and their exotic dancer employees established economic dependence by the exotic dancers on Defendants, and thus employee status. As a matter of economic reality, Plaintiff and dancers are not in business for themselves but rather are economically dependent on finding employment through Blush. Their work is the basis of Defendants business.

186. Defendants ONE THREE FIVE, INC. and ALBERT BORTZ understood rules exist regarding the classification of individuals as "employees" or "independent contractors."

187. However, dancers were still continued to be treated as employees instead of independent contractors.

188.

A. FLSA Coverage

1. All conditions precedent to this suit, if any, have been fulfilled.

2. At all times relevant to this lawsuit, Defendants are/were eligible and covered employers under the FLSA pursuant to 29 U.S.C. § 203(d).

3. At all times relevant to this lawsuit, Defendants are/have been enterprises engaged in commerce under the FLSA pursuant to 29 U.S.C. § 203(s)(1)(A).

4.  At all times relevant to this lawsuit, Defendants have employed, and continue to
    employ, employees including Plaintiff and the putative Collective Action Members
    who engaged in commerce or in the production of goods for
commerce as required by 29 U.S.C. §§ 206-207.

5.  At all relevant times, Defendants have had gross operating revenues or business
volume in excess of $500,000.


   B. FLSA Allegations

1.  The FLSA is to be construed expansively in favor of coverage, recognizing that broad
coverage is essential to accomplish the goals of this remedial legislation.

2.  "[N]either the common law concepts of 'employee' and 'independent contractor' nor
contractual provisions purporting to describe the relationship are determinative of
employment status." Mathis v. Hous. Auth. of Umatilla Cnty., 242 F. Supp. 2d 777, 783
(D. Or. 2002) quoting Nash v. Res., Inc., 982 F. Supp. 1427, 1433 (D. Or. 1997).

3.  Rather, to determine employment status under the FLSA's broad remedial purpose,
courts across the nation apply some variant of the "economic realities test." In this
Circuit, Real v. Driscoll Strawberry Assocs., Inc. sets out the relevant factor analysis:

4.  1) the degree of the alleged employer's right to control the manner in which the
work is to be performed; 2) the alleged employee's opportunity for profit or loss
depending upon his managerial skill; 3) the alleged employee's investment in equipment
or materials required for his task, or his employment of helpers; 4) whether the service
rendered requires a special skill; 5) the degree of permanence of the working relationship;
and 6) whether the service rendered is an integral part of the alleged employer's business.

5.  The presence of any individual factor is not dispositive of whether an
employee/employer relationship exists. Such a determination depends "upon the
circumstances of the whole activity."

603 F.2d 748 (9th Cir. 1979) quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947). In the end, the factors are aids used to determine whether "as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'" Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981) quoting Bartels v. Birmingham, 332 U.S. 126, 130 (1947).

5. On Nov 8, 2013, a group of exotic dancers filed a wage lawsuit ("the *Correll* case"), against ONE THREE FIVE, INC. d/b/a BLUSH for wage violations under federal and state law. The exotic dancers in the lawsuit alleged they were misclassified as independent contractors and were entitled to their wages for all hours worked. The Correll cases settled and came before the court for final approval.

189. Rather than Defendant pay its dancers the applicable minimum wage, Defendant classified its dancers as independent contractors and required its dancers to pay Defendant in order to work at Defendant's establishment.

190. Defendant does not compensate Dancers in any amount at least equal to the mandated minimum wage for each hour worked during their shift.

191. Defendant has violated and, continues to violate the FLSA, 29 U.S.C §§ 201*et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the flsa within meaning of 29 U.S.C. § 255 (A).

192. Defendant has violated and, continues to violate, the PMWA, 43 Pa. C.S.C. § 333.101 *et seq.*

193. Due to Defendant's FLSA and state law violations, Plaintiff is entitled to recover from the Defendant, compensation for unpaid wages; an additional equal amount as liquidated damages; attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

## CLAIM FOR RELIEF- UNJUST ENRICHMENT

194. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

195. It is black letter law that tips received by an employee are the employee's tips and an employer has no ownership interest in said tips. Indeed, according to the DOL's Regulations, "tips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA." 29 C.F.R. § 531.52.

196. Defendant unlawfully retained a portion of tips Dancers received from Defendant's customers.

197. Defendant also mandates the fees a Dancer charges for her entertainment as a dancer during private dances and champagne rooms. Private dances are $30 per song, in which a dancer pays the Defendant $10 and there are additional times during the day where the dancer must offer the price of 2 private dances for the price of one at $30. There is also a discounted rate for buying 3 dances at a time.

198. In the champagne rooms, the club sets the price of $220 for 30 minutes of private dancing and conversation with the dancers, of which a dancer must pay the Defendant $105 plus tip out to the VIP room attendant. For a one hour rate, the rate is $360 and Dancers must pay the defendant a similar proportion, approximately half.

199. These deductions are in contravention of applicable law.

200. Defendant subjects its dancers to mandatory tip-outs to certain other employees of Defendant. The dancers must tip out to the House Mom, DJs, VIP room and private dance area managers and the front desk.

201. Defendant requires these tip-outs and is therefore reducing its labor cost by having the Dancers supplement the compensation Defendant pays its other employees.

202. Additionally, there are mandatory house fees and fines required of the dancers to be paid to Defendant during each shift. Despite routinely charging customers a "cover fee" at the door, and selling food and alcohol, Defendant retains all of the income and does not pay the Dancers any wages.

203. Defendant requires its dancers to pay "House Fees" for each shift that Dancers work. These fees are mandatory and are enforced by the Defendant. A dancer working 5 days a week at the club can pay mandatory fees anywhere from $165-$240 per week just in house fees depending on the time she had arrived for her shift. This is because Defendant assesses "late fees" to the dancers. These fees are paid in addition to the other required fees and tip outs during each shift.

204. Dancers are additionally required to spend a significant amount of money on dresses, gowns and other costume accessories required by the Defendant in order to give Defendant's customers the type of atmosphere intended by Defendant.

205. Dancers perform multiple times in an evening without pay on stage for the Defendant's customers to generate revenue for the Defendant by providing entertainment to its customers. Additionally, the Dancers are required to be on the floor most of their shift sitting and socializing with these customers during their shift and encouraging them to purchase and spend money on alcohol even when the

dancer isn't paid any wages. The dancers are to encourage the customers to spend money on lap dances and champagne rooms in order for them to make money.

206. Defendants also make additional profits at the expense of the dancers by selling the "Blush Money" aka "Blue Money". Dancers must also accept the "Blush Money" as a form of payment or tips from the customers. Dancers exchange this club printed money into legal currency at the end of their shift. The Defendant charges 10% to the dancer to exchange this club money in addition to charging the customer 10% for purchasing this "Blush Money".

207. Dancers were subjected to unlawful deductions from their gratuities.

208. Defendant retained the benefits of its unlawful deductions from the gratuities from Plaintiff under circumstances which rendered it inequitable and unjust for Defendant to retain such benefits.

209. Defendant has been unjustly enriched to the detriment of the Plaintiff by: 1.) Requiring Plaintiff to pay money out of her tips to pay for the ordinary business expense of Defendant 2.) requiring Plaintiff to forfeit a portion of her tips to the Defendant 3.) paying Plaintiff less than the mandated minimum wage and overtime compensation while failing to comply with the requirements for doing so 4.) imposing house fees and late fees in addition to making the Plaintiff work a required scheduled 5.)requiring the Plaintiff to perform, socialize and entertain its customers without pay5.) charging an additional 10% on all "Blush Money" that the Plaintiff has earned

210. A declaratory judgment that the practices complained of herein are lawful under the FLSA and PMWA was issued.

211. Defendant continued to follow the same unlawful business practices after the judgment was issued.

212. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff is entitled to reimbursement, restitution and disgorgement from Defendant of the benefits conferred by Plaintiff.

## CLAIM FOR RELIEF-NEGLIGENCE

213. Plaintiff incorporates and realleges above paragraphs of this Complaint as if the same has been set forth herein.

214. Lack of consent is a fundamental requirement of the battery tort. The consent requirement ties in with the fundamental proposition that every human being has a right to decide what happens to his or her own body. Another requirement for a battery claim is a showing that the contact was unprivileged. There is an overlap

between the concepts of lack of privilege and lack of consent. The element of lack of privilege also overlaps with the requirement of of intentionality.

215. When describing an act of "intent", a "mistake" does not absolve an actor from liability for the harm caused his intentional act.

216. Plaintiff brings this cause of action for Negligence, while many allegations meet the requirements for separate causes of action, many torts in this Complaint are the result from Negligence as well as intentional malice.

217. To bring a Negligence claim a Plaintiff must only prove that the Defendant owed a legal duty of care, breached that duty and therefore the Plaintiff suffered an injury.

218. Defendant, with reckless disregard failed to call the police or seek medical attention for the Plaintiff after she requested that they be called while she was at Blush suffering from a severe mental impairment.

219. Instead, Defendant's general manager made the mistake of believing she was on drugs. He should have known from the evening prior after he complained at work that she wasn't feeling well, that something was not right and he had forced the Plaintiff out of the club by placing his hand on her back and pushing her towards a male individual who he had ordered to take her out of the club.

220. This male individual who she was forced to leave with was a former employee, who was at the club drinking for hours with a friend of his who the Plaintiff did not know.

221. Additionally, Plaintiff told the general manager that she was afraid and did not want to leave with him.

222. Plaintiff was not taken home and was driven to multiple places with him while suffering from delusions and hallucinations. Plaintiff was later assaulted and taken advantage of by this individual.

223. Plaintiff was driven back to the club almost a day later where she was now suffering from severe physical symptoms of impairment.

224. Plaintiff was then later in the evening hospitalized for almost two weeks in November 2015.

225. Additionally, this Complaint also shows negligence of the Defendant, by negligent supervision and retention of employee and negligent failure to stop harassment of its employees.

226. Furthermore, the Defendant has with intentional negligence refused to follow Federal and state wage laws.

## DAMAGES

The Plaintiff has suffered from the following damages:
economic losses, financial losses in other employment, personal injuries, neurological issues, psychological distress including PTSD, in addition to depression, anxiety, pain and suffering and loss of social activities among many other specific damages that occurred

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for relief in the following forms:

A. A declaration that the defendants have violated pertinent sections of the ADA and PA State Law

B. An award of pecuniary losses to Plaintiff

C. An award of compensatory damages to Plaintiff, including back pay and compensation for mental anguish and loss of enjoyment in life

D. An award of punitive damages to the Plaintiff

E. Lost earnings

F. Incidental expenses occurring while seeking other employment

G. A declaratory judgment that the practices complained of herein are unlawful and under the FLSA and PMWA

H. An award of unpaid minimum and overtime wages to Plaintiff

I. Restitution of wages and gratuities improperly retained by Defendant

J. An award of liquidated damages to Plaintiff

K. An award of costs and expenses and attorneys' fees to Plaintiff

L. Any other relief to which the Plaintiff is justly entitled

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this complaint.


Dated: October 27, 2017                                  Respectfully submitted,


                                                         **ReJeana Silla**

                                                         Pro Se Litigant

                                                         430 Taylor St.
                                                         Pittsburgh, PA 15224
                                                         (412)694-3806