**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAN 19 2018

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

| | | |
|---|---|---|
| REJEANA SILLA | ) | CIVIL ACTION NO. 17-1393 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| v. | ) | **FILED PURSUANT TO** |
| | ) | **RULE 15(a)(1)(B) FRCP** |
| ONE THREEE FIVE INC. d/b/a | ) | |
| BLUSH AND ALBERT BORTZ | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**
**FILED PURSUANT TO RULE 15(a)(1)(B) FED. R. CIV. PRO.**

**JURY TRIAL DEMANDED**

ReJeana Silla
430 Taylor St.
Pittsburgh, PA 15224
(412) 694-3806

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REJEANA SILLA | ) | CIVIL ACTION NO. 17-1393 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| v. | ) | |
| | ) | |
| ONE THREEE FIVE INC. d/b/a | ) | |
| BLUSH AND ALBERT BORTZ | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## FIRST AMENDED COMPLAINT
## FILED PURSUANT TO RULE 15(a)(1)(B) FED. R. CIV. PRO.

Plaintiff, ReJeana Silla, an individual, brings this lawsuit and files the following First

Amended Complaint against the Defendants, One Three Five, Inc. d/b/a/ Blush and Albert

Bortz, individually (hereinafter collectively referred to as "Defendants"), for the Defendants'

violations of the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964 in

addition to other claims for violations of the Fair Labor Standards Act and other state law

and alleges the following:

## INTRODUCTION

1.     Plaintiff incorporates by reference and adopts all of the facts alleged in the original

Complaint as true in this First Amended Complaint. Rule 10(c) provides that statements in a

2

pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.

2.      This action is brought by the Plaintiff against Defendants, One Three Five Inc. ("Blush") and Albert Bortz, in his individual capacity, for violations of Title I of the Americans with Disabilities Act, 42 U.S.C., §§ 12101 et seq., which incorporate, through 42 U.S.C. § 12117(a), the powers remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.

3.      Plaintiff also brings a claim alleging a violation of her rights under Title III of the ADA, 42 U.S.C. § 12188. This claim arises from allegations that were also alleged in the original Complaint (Complaint ¶ 54). 42 U.S.C. § 12188(a)(a) adopts remedies and procedures of § 204(a) of the 1964 Civil Rights Act (42 U.S.C. §2000a-3(a)) Individuals may be liable if they are the owner, lessor/lessee or operator of public accommodation. 42 U.S.C. § 12182(a); Courts typically require evidence that such individual had supervisory power or control. See e.g. *Lentini v. California Center for the Arts, Escondido*, 370 F. 3d 837, 849-850 (9th Cir. 2004)

4.      Defendants are employers within the meaning of 42 U.S.C. § 12111(5) and covered entities within the meaning of 42 U.S.C. § 12111(2) and 29 C.F.R. § 1630.2(b).

5.      Defendants are also employers within the meaning of the FLSA. To be liable for violations of the FLSA, the defendant must be an "employer." 29 U.S.C. § 206. The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "Person may be liable under the FLSA in an individual capacity while serving as a corporate employer if the individual

3

defendant has control over the terms of the employee's employment." *Hartman v. Regents of the Univ. of Colo.,* 22 P.3d 524, 530 (Colo. Ct. App. 2000).

6.      Employee and employer relationships are among the basic building blocks of our economic and societal structure, affecting most people over the greater part of their lives. Employment is the means by which society's goods and services are provided and through which individuals obtain part of their identity, including the ability or inability to successfully meet life's daily economic responsibilities of food, shelter and clothing. Employment also serves social purposes. The workplace is a place to meet people, converse, and form friendships. Likewise, the type of employment undertaken may confer social status on employee and family. Employment loss can be a considerable hardship having disastrous consequences. Fifty years ago, one observer wrote:

> "We have become a nation of employees. We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for all of their income is something new in the world. For our generation, the substance of life is in another man's hands." *F. TANNEBAUM, A PHILOSOPHY OF LABOR 9 (1951)*

## PARTIES

7.      Plaintiff, ReJeana Silla, is an adult individual residing at 430 Taylor St., Allegheny County, Pittsburgh, PA 15224 who was employed by Defendants as a dancer at Blush.

8.      Defendant, One Three Five Inc., d/b/a Blush Gentleman's Club, is a Pennsylvania corporation and an adult entertainment establishment incorporated under the laws of the State of Pennsylvania, with a principal business address and is doing business at 135 9th St.,

Allegheny County, Pittsburgh, Pennsylvania 15222 and operates an adult nightclub under the name "Blush." At all relevant times, upon information and belief, Blush's annual gross volume of sales was not less than $1,000,000.00.

9.      Defendant, Albert Bortz, solely owns the corporation, One Three Five Inc., and the property and building on and which Blush operates. Albert Bortz operates and has complete control and supervision of his corporation and the business operations of Blush and its employees and is involved in its employment decisions and daily operations. Specifically, Albert Bortz (1) exercised a high degree of operational control over the terms and circumstances of Plaintiff's employment; (2) supervised, directly and indirectly, the work performed by the Plaintiff; (3) directly and indirectly exercised the right to hire, fire, or modify Plaintiff's employment conditions;

10.     Notably courts that have determined that exotic dancers are employees have held both the dancer club and its individual owners liable for their violations of the FLSA and state labor laws. *Thompson v. Linda & A., Inc.,* 779 F. Supp. 2d 139,153 (D.D.C.2011) ("As the plaintiffs' employers, both Allen and The House are liable for violations of the FLSA and the District of Columbia wage laws.") see also *Mason v. Fantasy's Gentleman's Club* (D. Colo. July 27, 2015) (as the plaintiffs' employers, both Eardley and the corporation were held liable)

## JURISDICTION

11.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1343 as it is a civil rights action arising under the laws of the United States. Plaintiff is alleging violations of her rights under Title I of the Americans with Disabilities Act, 42 U.S.C.A, §§ 12101 *et. seq.* (the "ADA") and also under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182(a)).

12.     This Court also has original jurisdiction of this claim herein pursuant to 28 U.S.C. § 1331 and § 1343(4). This civil action arises under the Constitution and laws of the United States. Plaintiff is alleging violations of her rights under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e *et seq.*

13.     The Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 201 *et seq.*

14.     Further, this Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims in the action of which the courts have original jurisdiction and the claims derive from a common nucleus of operative facts.

## PROCEDURAL REQUIREMENTS

15.     On April 19, 2016, Plaintiff filed a charge of discrimination against Defendants, satisfying the requirements of the Equal Employment Opportunity Commission. Such charge was filed within one hundred eighty (180) days after the alleged unlawful employment practice occurred.

16.      On July 31,2017, less than ninety (90) days prior to the filing of the Complaint, the

EEOC issued to the Plaintiff a Notice of Right to Sue with respect to such charges of

discrimination, the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act

of 1964, and the Genetic Information Nondiscrimination Act (GINA).

17.      The incidents described in part below were part of a continuing series of incidents of

harassment and discrimination which constitute a continuing violation by Defendants of the

Plaintiff's rights under the ADA and Title VII. The incidents described below also show a

continuing violation of the Plaintiff's basic work place rights and Defendants' violations

under the Fair Labor Standards Act.


## FACTUAL BACKGROUND

18.      Plaintiff was hired at the age of 18 as a dancer in 2005 by Defendant, Albert Bortz.

Plaintiff was hired to work at Defendant's establishment, Club Elite located at 135 9th Street,

Pittsburgh, Pennsylvania. "Club Elite" is the former name of the Defendant's current club

name, Blush Gentleman's Club.

19.      In the ten plus years that the Plaintiff has worked for the Defendants, she built a

dancing career over the years. In addition to working for the Defendants, dancing in

Pittsburgh, the Plaintiff also traveled frequently with other Blush dancers and worked at

many different clubs throughout the country while still being employed by the Defendant.

20.      Many dancers also travel to dance at Blush and also dance at other gentleman's clubs.

21.      In addition to working as a dancer, the Plaintiff also worked for the Defendants,

Albert Bortz and One Three Five Inc., promoting for the club at different events.

7

22.     Plaintiff worked an average of 4-6 days a week for the Defendants, while sometimes working double shifts. Plaintiff was required to make and work a weekly schedule that was required and made by Defendant, Albert Bortz.

23.     At times while working for the Defendants, Plaintiff would sometimes work an excess of 12 hour days and 40 hour weeks. In the years that the Plaintiff has worked for the Defendants, the Plaintiff has paid the Defendants an extremely significant amount of money from her profits from the champagne rooms, private dances, house fees, late fees, fines, ten percent of all credit card tips, and additional income that the Plaintiff has earned for the Defendants, such as club admission from customers, promoting for the club, liquor sales and returning regular customers over the years.

24.     The Plaintiff was required by Defendant, Albert Bortz to schedule a minimum of three days and one day shift per week.

25.     Defendant, Albert Bortz required the Plaintiff and the other dancers to work their scheduled shifts, which consist of 6-7 hours a day. The Defendants also require the dancers to stay until the end of their shifts, under the threat of fines or termination.

26.     In addition to the required schedule, the Defendant, Albert Bortz charges fines, late fees and imposes possible suspensions for calling off work or showing up late to work.

27.     In addition to the fines and late fees, the dancers are required to pay house fees, DJ fees and other tip outs. The Defendants require the dancers to pay these tip outs to their other employees to reduce their labor costs they pay its employees.

28.     The Defendants also profit a portion of the income earned by the dancers in the champagne rooms and private dances. The amount the dancers are to charge the customer

8

for these services and the amount they are required to pay the Defendants are set by Defendant, Albert Bortz.

29.     In addition to the profits that the Defendants earn from the dancers' private dances and champagne rooms, the Defendants also charge an unlawful 10 % on all of the credit card tips earned by the dancers in addition to charging the customers 10% for the credit card transaction. The dancers pay the Defendants 10% of their earned "Blush Money", which is the name for the club printed money which is obtained from all customer credit card transactions. Therefore, the Defendants are making an additional 20% to the profits earned from the lap dances and champagne.

30.     The Defendants do not pay their dancers any wages, yet the dancers are still required to make a schedule to work hourly shifts, during these shifts the dancers are required to dance multiple times throughout the evening on different stages in the club as part of the club's entertainment. The dancers are also required to be on the floor socializing and working for most of the duration of their shifts.

31.     The Defendants significantly control and direct the manner in which the dancer's, the Plaintiff's, work is to be performed. Dancers are integral parts of the Defendants' business. The dancers are the primary entertainment and main source of revenue for the Defendants, and without them, the Defendants would not be in business as a gentleman's club.

32.     One of the three great relationships in private life that shapes our daily affairs is that of master and servant, which is founded in convenience, whereby a man is directed to call in assistance of others, where his own skill and labor will not be sufficient to answer the cares incumbent upon him; *W. BLACKSTONE, COMMENTARIES 410 (1765).*

9

33.     There is an extensive list of club rules and requirements of the dancers to be performed during these shifts. A dress code is also strictly enforced, outfits and accessories are required for the dancers of Blush. The Defendants also require the dancers to buy and wear expensive gowns to give their customers the type of "atmosphere" that they intend. These dresses are available for purchase in the house store, also owned by the Defendant, Albert Bortz and his wife, Sabrina Bortz. They also control as to how much makeup the dancers are required to wear. Defendants do not reimburse the Dancers for the cost of their required outfits.

34.     Defendant, One Three Five Inc., ("Blush"), is an adult entertainment establishment that caters to male clientele by providing entertainment by female dancers, the Plaintiff, in various states of undress.

35.     Defendants' business is based entirely on the use of the dancers in order for the company and its owner to earn a profit. Defendants do not pay them any money for the work that is performed.

36.     The Plaintiff had started her dancing career when she was 18 working for the Defendants. The acts alleged in this complaint also ruined her ability to be able to dance at other clubs and prevented future income at other clubs. Plaintiff was exposed to defamation, embarrassment and PTSD from the events that occurred. The Plaintiff was subjected to physical and mental abuse by different individuals who were employees of the Defendants.

37.     On March 14, 2015, Plaintiff was suspended for six months by the Defendants' general manager after she had called off work. This was not a typical suspension, and the Plaintiff was initially only supposed to be suspended for a week for calling off. During the

evening that the Plaintiff called off work, she was sexually and verbally harassed by two separate female dancers from Blush. The Plaintiff was told she was never getting her job back and they ended up making the Plaintiff leave very early in the morning after having her come to where they were staying and then once she arrived, started questioning why she was there. (original Complaint ¶ 28).

38.     A few weeks later during the Plaintiff's birthday, the same dancers mentioned in the above paragraph had harassed the Plaintiff again regarding her birthday, sexually harassed the Plaintiff by making up accusations about her, and also harassed her about her job suspension that occurred on March 14, 2015.

39.     The Defendants' general manager, would continually discuss the status of the Plaintiff's job with other employees and customers. (original Complaint ¶ 30).

40.     In May, 2015, Plaintiff was subjected to more slander and harassment by another employee of the Defendants after one of the Plaintiff's work trips to New York, and rumors and false and embarrassing allegations were spread about the Plaintiff by this dancer. Plaintiff was also not allowed to attend a social event at the club during her suspension after she returned from the trip to New York City. (original Complaint ¶ 31).

41.     In June, 2015, the same dancer mentioned in the above paragraph in addition with two other dancers, who were employees for the Defendants, intentionally and maliciously sabotaged Plaintiff's trip to Las Vegas. During the trip, the Plaintiff was subjected to defamation, sexual harassment and photos and posts made on social media by these dancers with sexually degrading comments and insults. This was a preplanned trip that the Plaintiff had planned with other dancers, the Plaintiff traveled to Vegas with one of the dancers, who

during the trip poured water on the Plaintiff while she was sleeping. The dancers blocked the Plaintiff on social media and the Plaintiff was left stranded for almost two weeks while out in Vegas by herself after the dancers posted online that she was not going to be getting hired anywhere out there. The trip was preplanned with one of the dancers who lived and worked both in Pittsburgh for the Defendants and in Las Vegas. (original Complaint ¶ 32).

42.     On October 15, 2015, Plaintiff was jumped and punched in the head multiple times at an after-hours club, which was initiated by the same dancer referred to from the New York City trip.

43.     In November, 2015, Plaintiff suffered from a stress-induced psychotic break.

44.     On November 21, 2015, the Plaintiff was at work at Blush and and started to not feel very well while she was working and started to suffer from mild confusion and extreme anxiety. In addition to the anxiety that the Plaintiff was already having, she was pranked by a group of individuals at Blush. There was no maliciousness in this prank that occurred, yet the Plaintiff did start to develop mild delusions later in the evening as a result from it. Plaintiff informed the general manager of this and of how she was feeling, and he told her not to worry about it and that she should not be concerned with what the group of individual customers in the club were saying to her. Plaintiff returned home after work that evening where the delusions progressed and the Plaintiff developed a stress induced type of insomnia.

45.     The following day on November 22, 2015, while the Plaintiff was in an impaired mental state, she had contacted an individual who was a previous front desk employee for the Defendants to pick her up and take her back to the club. However, when he picked her

up in the morning, he did not take her directly to the club because he had errands to run all day and did not end up taking her to the club until later in the evening. While he was out running his errands during the day, the Plaintiff was informing him of very irrational beliefs she was having, and made no suggestion or reference to her that something was wrong with the way she speaking or thinking. Instead, especially later in the evening he would reassure her and contribute to the irrational beliefs she was having. After he had driven her to Blush, he sat with a friend of his drinking at the club for hours, the Plaintiff briefly left for a while to get something to eat and then returned to the club.

46.     While at the club, the Plaintiff was in a state of confusion, mental impairment and an extreme state of fear as a result of the mental impairment. The Plaintiff's pupils were also extremely dilated. The general manager stated to the Plaintiff, that because of how her pupils looked, that she was on drugs. When the Plaintiff told him that she was not on any drugs and had not drank any alcohol, he still did not believe her, accused her of being on drugs and said she had to leave. The Plaintiff asked him to call the police because something was not right, additionally, she also asked him to call the owner, Albert Bortz. The general manager initially picked up the phone and said he would call the police, and then he changed his mind, decided not to call the police and told the Plaintiff to leave. The Plaintiff just informed him that she started not to feel well the evening prior while working, so he should have known something was not right instead of discriminating against her by assuming that she was on drugs even after she stated to him that she wasn't.  Instead, he just ignored what the Plaintiff was telling him. The Plaintiff was also tested later after being admitted to the hospital and no drugs or alcohol was found in her system. The general manager then

informed the male individual who brought her to the club, and who had been drinking for hours at the club to take the Plaintiff out of the club with his friend. The Plaintiff informed the general manager that she was afraid to leave with him and did not want to leave with him. Instead, he still forced the Plaintiff to leave with the Defendant's former employee after she had asked multiple times for the police or someone to be called.

47.     Once the Plaintiff left with this individual, the state of her medical condition had severely progressed, and she was taking advantage of mentally and physically by sexual assault. The Plaintiff also suffered from additional trauma and neglect, because while in this state he drove the Plaintiff around for another day to different places while lying to her and pretending that the beliefs she was having were true. During this time the delusions had progressed further into audible and visual hallucinations.

48.     A day later on November 23, 2015, the Plaintiff was driven back to the club by this individual. Once the Plaintiff returned to the club, he did not come back into the club. At this time, the Plaintiff was not only suffering from severe hallucinations, but she was also experiencing neurological damages to where her body was also under severe motor impairment and twitching. The police were called to the club, where the Plaintiff informed them of the irrational beliefs she was having. They did not take the condition too seriously, and the Plaintiff ended up leaving the club on her own. By the time the Plaintiff was even hospitalized later in the evening, which was almost three days without any sleep due to the insomnia, the Plaintiff's condition at the hospital was diagnosed at the time as severely mentally disabled. (original Complaint ¶¶ 38-41)

49.     On November 23, 2015, Plaintiff was admitted to Western Psychiatric Hospital, where she was admitted for 12 days during the holiday season.

50.     While the Plaintiff was in the hospital, she was visited by the Defendant, Albert Bortz's wife, Sabrina Bortz. Plaintiff had agreed to sign a release for them to have the records from her drug test and for them to be able to discuss her medical information with the hospital.

51.     A few days after the Plaintiff was released from the hospital, she returned back to work at the club. Some times while at work, the Plaintiff would start to feel overwhelmed for many different reasons, including comments made by the general manager and other employees. Sabrina Bortz had even informed the Plaintiff that some of the dancers were messing with her. The Plaintiff then decided to take a break from the club, and Albert Bortz had informed her that was fine. The Plaintiff took a two week break on December 21, 2015.

52.     On January 4, 2016, the Plaintiff had a drink thrown on her during a New Years Eve party at a night club and was pinched by one of the dancers who was employed by the Defendant. (original Complaint ¶ 49).

53.     The Plaintiff spoke with Albert Bortz over the phone and informed him she was going to come back to work. He told the Plaintiff that he wanted an authorization signed for release of her medical information from her therapist and psychiatrist's office in order for them to discuss information with them regarding the Plaintiff and in order for her to work there. The Plaintiff had agreed with him that was fine, so she could continue to work there and the Plaintiff returned to work within the following week in January, 2016. The plaintiff signed release forms for authorization for the Defendants from the medical office at the

15

Primary Health Network to release information and give permission for Defendant, Albert Bortz and his wife Sabrina Bortz to obtain and discuss Plaintiff's medical records with the office.

54.     Once the Plaintiff returned to work she dealt with more harassment such as being called "schizophrenic" by one of the dancers because of her hospitalization, and other dancers would tell her in front of customers that the general manager was calling her crazy and did not want her there. Plaintiff was also additionally harassed while working in front of customers by certain dancers. The general manager would also make comments to the Plaintiff that she was not trying to make money like she normally did. (original Complaint ¶46-47)

55.     On February 7, 2016 the Plaintiff received a phone call from the Defendants' general manager while she was at home. He informed her that she was being taken off of the schedule and was being fired at this time and they couldn't have her work there anymore because she was hearing voices. When she told him that was not true, he proceeded to call her crazy and said that she was in the hospital for hearing voices and they just couldn't have her there. The Plaintiff told him that Albert and Sabrina were already well aware of the incident that led to her hospitalization, and that she wasn't hearing voices. He continued to call her crazy again and said he was busy and had to go. She then asked to speak to the owner, Albert Bortz, and the manager informed her that he was on vacation and would be back in about a week.

56.     Within the few days following the Plaintiff's suspension, the Defendants had hired back one of the employees who was involved in some of the incidents referred to above. ( ¶¶ 39-41,51)

57.     Plaintiff called the club about a week later and spoke to the Defendant, Albert Bortz, who informed the Plaintiff that she could not work there anymore. The Plaintiff informed him of the conversation she had with the general manager and that he was accusing her of hearing voices and calling her crazy. She also told him that the manager said she could not work there because she was in the hospital for those reasons. The Defendant, Albert Bortz then told the Plaintiff that they weren't the crazy ones and told her to go and try to work somewhere else and see what they think. The Plaintiff then told him she was following up with her therapists like he had asked and asked if she could call back in a few weeks to talk to him regarding her job, he said no and then he hung up on her. The Plaintiff then went and worked at the Penthouse Club and on the first day at work there since being fired at Blush, the Plaintiff was subjected to a sexual assault and a few days later had threats made to her by one of the dancers who also worked for the Defendants, because she reported the incident that occurred. This dancer also posted photos of the Plaintiff on her social media. These photos consisted of sexual derogatory signs that were placed on the Plaintiff at the Penthouse Club while she was sleeping waiting for her ride at the end of her shift in the dressing room and while food was also put on her. The Plaintiff was barely dressed when the signs were made and photos were taken by one of the managers for the Penthouse Club. This was not the first time that the dancer and one of the managers had taken crude photos like this of the Plaintiff.

58.     On April 19, 2016, the Plaintiff stopped into Blush to personally speak with the

Defendant, Albert Bortz and management. The Plaintiff was informed that Albert was on

vacation and she had asked to speak with the manager. One of the dancers came into the

lobby and told the Plaintiff that the manager, Ryan, who is the son of Sabrina Bortz, said

that she needed to leave and that they did not want her there and she had to go. The Plaintiff

then informed the dancer that she wanted to talk to him because she had signed all of the

proper release forms that the Defendants had asked and she was told that she had to leave.

The Plaintiff was not even permitted to be on the premises of the club, which is a public

place after she was fired for the reason of her having a disability. The Plaintiff even tried to

message Sabrina Bortz and management without receiving any messages in return prior to

going there to talk to them in person. (original Complaint ¶ 54).

59.     On April 19, 2016, Plaintiff filed an initial complaint with the Pennsylvania Human

Relations Commission.

60.     On July 6, 2016, a formal complaint of discrimination was filed against the

Defendants with the EEOC and Pennsylvania Human Relation Commission. The

commission encourages both parties to consider negotiating a settlement prior to a

Commonwealth determination on the merits of the Complaint. Plaintiff was informed by the

commission that the fact finding conference that was scheduled on December 8, 2016, was

cancelled due to the Defendants' decision not to attend. The Plaintiff was later informed that

that the Defendant still decided to attend without her being notified.

61.     Plaintiff's stress, anxiety, and depression continued to get worse from the job loss and

especially in looking for other employment. The stress and anxiety also affected other

18

aspects of her daily life. On May 8, 2016, the Plaintiff was also diagnosed with depression at Allegheny Valley Hospital. (original Complaint ¶¶ 57-58).

62.     The Plaintiff saw the Defendant, Albert Bortz on July, 17, 2016 at a club in downtown Pittsburgh. Prior to this, the Plaintiff had not gone to many social events except New Years Eve since her hospitalization in November 2015. ( ¶ 52).

63.     The Plaintiff had a conversation with the Defendant, Albert Bortz, where they discussed a few different things such as, the incidents that occurred against the Plaintiff at the Penthouse Club, her filing with the Human Relations Commission, her employment with Blush and where she was currently employed, because he wanted to know where she was currently working so he could send business to her there. (original Complaint ¶ 60).

64.     On July 19, 2016, Albert's wife, Sabrina Bortz contacted the Plaintiff on social media and told her that she had seen photos online that the Plaintiff had seen the Defendant, Albert Bortz, while he was out one evening as mentioned in the above paragraph. She told the Plaintiff that she had not seen her in a while and wanted to meet her for lunch, and on July 22, 2016, the Plaintiff met with her at a local restaurant in downtown Pittsburgh where they talked about a number of things involving incidents that occurred with the Plaintiff and her employment at Blush. Some of the incidents that the Plaintiff informed her of, she said she was not aware had occurred. She also told the Plaintiff again during this time that she told her before that some of the dancers at work were messing with her while she was working. They also discussed other incidents that occurred and the conversation that the Plaintiff had with the Defendant, Albert Bortz, that is alleged in the above paragraph.

Plaintiff told her that she tried to contact her on social media, but she said that she did not receive any of her messages.

65.     Plaintiff received a letter from the Human Relations Commission that was mailed on Dec 7, 2016. The letter informed her that the office received the Respondent's answer to the allegations in the complaint. The Defendants' Answer contained denials to factual allegations alleged by the Plaintiff and also contained false information and allegations about the Plaintiff in the New Matter that they alleged.

66.     The Commission informed her that she had the opportunity to rebut the Respondent's Answer and to include in her rebuttal any documents, witness statements and/or any documents they should request from the Respondent. They also instructed her to provide answers to a list of items mailed from the commission.

67.     Plaintiff was given a notice to submit all of this information within fifteen days by December 22, 2016.

68.     Plaintiff submitted all of the above that was asked of and also her Rebuttal and Answer to the Defendants' New Matter in addition to Plaintiff's additional allegations that are alleged in this Complaint, and the Plaintiff never received any further response from the Defendants.

69.     Since the job loss and filing of the complaint with the commission and EEOC, the Plaintiff struggled with job searched and employment which added severe financial and emotional stress. Additionally, she has suffered with social losses, PTSD and other physical illnesses that required her to see many medical specialists, therapists and to have other testing done.

70.     The Plaintiff also asserts that while this is an extensive complaint, the allegations are clearly alleged and show the Court the duration and the different number of incidents that the Plaintiff was a victim to in addition to the multiple continuing acts and violations of the Defendants and needed to be asserted to show the Plaintiff states valid claims for relief. The Plaintiff also had to address and clarify issues in this complaint that were raised in the Defendants' motion to dismiss. *see* (ECF No.4). Additionally, many of the assertions can be easily addressed by confirming rules of law or confirming statements of fact.

71.     On June 22, 2017, the Plaintiff had a neuropsychological evaluation done, which had shown the Plaintiff to have anxiety, depression and a stress disorder.

72.     After two years of suffering with unknown causes for physical symptoms the Plaintiff was having, on December 20, 2017, the Plaintiff was able to get a proper diagnosis by her Psychiatrist's office at the Allegheny Health Network's, Department of Psychiatry, and was diagnosed and prescribed medication for Somatic Symptom Disorder. The Plaintiff is still continuing treatment with the Psychiatrist and the therapist's office.

73.     Lastly, the Plaintiff had seen a neurologist and a balance disorder specialist at UPMC on January 8, 2016 where he tested and addressed some of the additional balance problems to be a result from anxiety.

## CAUSE OF ACTION

## FIRST CLAIM FOR RELIEF-VIOLATION OF TITLE I OF THE ADA, DISCHARGE DISABILITY DISCRIMINATION

74. Plaintiff realleges and incorporates the above paragraphs as if the same has been set forth again herein.

75. To establish a prima facie case under the ADA, a plaintiff must show that: "She is a qualified person within the meaning of the ADA, that she is qualified to perform the essential functions of the job (either with or without reasonable accommodation), and that she has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises."

76. An "employer" for ADA purposes is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."

77. Defendant, One Three Five Inc., is an employer, and at all times relevant is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year," and has employed 15 or more employees throughout the relevant time period.

78. Defendant, Albert Bortz, is an employer, and at all times relevant is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year," and has employed 15 or more employees throughout the relevant time period.

79. Defendants are employers within the meaning of 42 U.S.C. § 12111(5), and covered entities within the meaning of 42 U.S.C. § 12111(2) and 29 C.F.R. § 1630.2(b).

80. On April 19, 2016, Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that the Defendants discriminated

against her in violation of the ADA by unlawful discharge from employment due to a disability.

81.    On November 24, 2015 Plaintiff was hospitalized and treated for a medical condition at Western Psychiatric Institute and Clinic where she was diagnosed with a disability after suffering from a severe stress induced psychotic break.

82.    Plaintiff had returned to work for the Defendants after the hospitalization where she had been harassed on multiple occasions while at work due to the disability and the hospitalization.

83.    Additionally, the Defendants' general manager, would discuss and insult the Plaintiff to other dancers, who later would also harass the Plaintiff regarding her job while at work. They would also make these insults to the Plaintiff infront of customers while she was at work.

84.    Plaintiff informed the Defendant, Albert Bortz on Dec 21, 2015, that she needed a break and that she was going to take a few weeks off. He informed her that was fine.

85.    The Plaintiff had returned back to work at Blush the second week of January, 2016. The Plaintiff had also worked two promotional events in January promoting for the Defendants on January 13, and January 24, 2016 at the convention center.

86.    Once the Plaintiff returned to work, the Plaintiff was still pranked and harassed at work. The Defendants were aware of this, and Sabrina Bortz would also have conversations with the Plaintiff letting her know that this was occurring while she was working.

87.    On February 7, 2016, Plaintiff received a phone call from the Defendants' general manager informing her that they couldn't have her work there anymore and he was taking

her off of the schedule because of her disability and because she was in the hospital due to her disability. He also called her crazy and had accused her of hearing voices. She insisted on talking to the owner, Albert Bortz, and was told that he was on vacation and would be back within a week.

88.     About a week later, the Plaintiff called Defendant, Albert Bortz. She informed him of the conversation that she had with the general manager and that he had taken her off of the schedule and was making up accusations about her hearing voices that wasn't true. Albert Bortz proceeded to tell her that she could not work there and said, "We aren't the crazy ones here, why don't you go and try to work somewhere else and see what they think." The Plaintiff then asked if she could please call back in a few weeks and he said no and hung up on her.

89.     After the Plaintiff was taken off of the schedule at Blush, she went and worked at the Penthouse Club where she became a victim of additional assaults and harassment the following week.

90.     Additionally, prior to when the Plaintiff was fired in February, the Defendant, Albert Bortz, required a release of personal medical information to them regarding the disability and had also required that the Plaintiff seek treatment with a therapist and a psychiatrist in order to keep her employment at Blush.

91.     Americans with Disabilities, § 12112(d)(4)(A) provides that a covered entity:

> Shall not require medical examination of their employees for the purpose of
> determining whether such employee is an individual with a disability or as to the
> nature or severity of the disability unless the examination is shown to be job-related
> and consistent with business necessity

92.     No covered entity shall discriminate against a qualified individual with a disability
because of the disability of such individual in regard to job application procedures, the
hiring, advancement, or discharge of employees, employee compensation, job training, and
other terms, conditions, and privileges of employment. 42 U.S.C. § 12112 (a)

93.     A covered entity may not participate in a contractual or other arrangement or
relationship that has the effect of subjecting a covered entity's qualified applicant or
employee with a disability to prohibited discrimination. 42 U.S.C. § 12112(b)(2)

94.     Because the Plaintiff is and was a qualified individual with a disability, and because
the Defendants terminated the Plaintiff's employment due to her disability, the Defendants
have discriminated against the Plaintiff in violation of 42 U.S.C.A § 12112(a)

**SECOND CLAIM FOR RELIEF- VIOLATION OF TITLE I OF THE ADA,
EMPLOYMENT DISCRIMINATION FOR HAVING A "RECORD OF" A
DISABILITY OR BEING "REGARDED AS DISABLED"**

95.     Plaintiff realleges and incorporates paragraphs above as if the same has been set forth
again here in.

96.     Although the Plaintiff has suffered from and was diagnosed with a disability, to bring a
discrimination claim under the ADA, a plaintiff need not prove that she actually suffers from,
or has been diagnosed with, a disability. An employee may state a valid cause of action if she
is "regarded" by her employer as having a record of impairment that substantially limits one
or more of her major life activities.

97.     Defendants not only intentionally discriminated against Plaintiff in violation of the
ADA by its discharge of her due to a disability, but in that they also discharged her by
accusing her of hearing voices, and because she was in the hospital due to the disability.

98.     As a direct and proximate result of said intentional and discriminatory conduct, Plaintiff

has not only lost income and other benefits, but she has suffered severe emotional distress,

humiliation, embarrassment, pain and suffering, future employment in the dancing industry,

and she had suffered other losses, all of which will be proven at the trial of this action.

99.     Defendants' discriminatory conduct exhibited a willful and reckless indifference to

Plaintiff's federally protected right to be free from disability discrimination.

## THIRD CLAIM FOR RELIEF- VIOLATION OF TITLE I OF THE ADA

100.    The Plaintiff realleges and incorporates the above paragraphs as if the same has been

set forth here in.

101.    The Defendants had required that the Plaintiff sign a release of her medical

information and an authorization to give permission for them to speak with her psychiatrist's

office at the Primary Health Network in order to keep her employment there, which was

after the Plaintiff had already been asked to sign a release of information for the Defendants

to speak with hospital staff and obtain a copy of her drug test during her hospitalization in

November 2015. The Plaintiff had signed a release of this information to the Defendants.

102.    By participating in a contractual or other relationship that had the effect of subjecting

the Plaintiff to prohibited discrimination on the basis of a disability, the Defendants have

violated 42 U.S.C. § 12112 (b)

## FOURTH CLAIM FOR RELIEF- VIOLATION OF TITLE III OF THE ADA

103.    The Plaintiff realleges and incorporates the above paragraphs as if the same has been

set forth here in.

104.    Title III of the ADA provides that "no individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a)).

105.    To prove a Title III ADA claim, a Plaintiff must prove 3 elements in order to prevail: (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the defendant owns, leases, or operates a place of public accommodation; and (3) that the defendant discriminated against the plaintiff on the basis of his/her disability.

106.    The ADA covers not only intentional discrimination, but also the discriminatory effects of benign neglect, apathy, and indifference.

107.    Title III does not cover employment discrimination, which is instead covered by Title I of the ADA, but it does however protect individuals who are not employees from work-related discrimination. see e.g. *Menkowitz v. Pottstown Memorial Medical Center,* 154 F.3d 113 (3rd Cir. 1998) (independent contractor doctor could sue hospital for discriminatory denial of staff privileges)

108.    One general rule of general prohibitions is construed to prohibit covered entities from the goods, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. §36.202(a)

109.    Violation of a general prohibition alone is sufficient to state a prima facie case.

110.    Individuals may be liable if they are the owner, lessor/lessee or operator of public accommodation. 42 U.S.C. § 12182(a); Courts typically require evidence that such individual

27

had supervisory power or control. See e.g. *Lentini v. California Center for the Arts, Escondido*, 370 F. 3d 837, 849-850 (9th Cir. 2004)

111.     Defendant, Albert Bortz, owns, operates and has supervisory power and control of Defendant, One Three Five Inc., ("Blush"), and is involved in the daily operations of the club and its employees.

112.     While the Defendants violated the Plaintiff's rights under Title I of the ADA for employment discrimination, they also violated under Title III of the ADA, because after they fired the Plaintiff due to a disability, she was not even permitted to be on the premises of the club. Title III of the ADA also prohibits retaliation. (original Complaint ¶ 54).

## FIFTH CLAIM FOR RELIEF- INVASION OF PRIVACY

113.     The Plaintiff realleges and incorporates the above paragraphs as if the same has been set forth again here in.

114.     The fourth claim is for Invasion of Privacy. To state a claim, the Plaintiff must allege the following key elements (1) intentional conduct that (2) intrudes upon a (3) sphere or zone of privacy in (4) a way that the law deems especially offensive

115.     An important dictum emphasizes that the defendant must be seeking information about the plaintiff "by improperly intrusive means".

116.     The Defendants required a release of the Plaintiff's personal and medical information on more than one occasions. The Defendants did this by offensive and intrusive means, because they had required the Plaintiff to do this as a stipulation of keeping her employment at Blush, which was also a product of "duress". Plaintiff was fraudulently misled by believing that she had to permit them to view her records and give them permission with her

28

psychiatrist's office in order to keep her employment at Blush. Plaintiff also signed a release

of authorization for them to speak and obtain information about the Plaintiff including drug

test results during her hospitalization at Western Psych in November 2015.

117.     The Defendants also violated Federal law under the ADA in regards to Defendant,

Albert Bortz requiring a release of her medical records and to seek treatment and sign a

release from the psychiatrist's office in order for her keep her employment with Blush.

118.     Americans with Disabilities, § 12112 (d)(4)(A) provides that a covered entity:

> shall not require medical examination of their employees for the purpose of
> determining whether such employee is an individual with a disability or as to the
> nature or severity of the disability unless the examination is shown to be job-related
> and consistent with business necessity

119.     She was also required to bring in copies of her drug test results from her outpatient

treatment in 2014, even though the Plaintiff still brought copies of her records from her

treatment program, Defendants still alleged and made false accusations of Plaintiff coming

into work on drugs.

120.     In addition to being required to sign these releases in order for her to continue her

employment with Blush there are also additional violations of invasion of privacy laws that

the complaint alleges. In recent years many legislatures and courts have found reasons to

limit intrusion into private areas. This also regulates disclosure of employment information

to third parties. When employers disclose employment information to third parties other

interests are implicated.

121.     The Defendant's general manager discussed Plaintiff's employment status with other

employees and customers of Blush in addition to making derogatory statements regarding

Plaintiff and her disability to other employees and to customers.

122.     Statements made to an employer's clients may cause embarrassment, may subject an employee to ridicule, or may have even more direct economic impact, by limiting future employment prospects.

123.     Even though the Plaintiff has already showed multiple causes for invasion of privacy, other circumstances would occur to also show other forms of invasion of privacy. For example, Sabrina Bortz would have conversations in the dressing room with the house mom and other employees regarding the Plaintiff after her hospitalization in November 2015.  In *Bratt v. International Machines Corp.*, 392 Mass. 308,467 N.E.2d 126 (Mass.1984), the court found an employer breached the state's privacy statute if it wrongfully disclosed an employee's medical information.

## SIXTH CLAIM FOR RELIEF- VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

124.     Plaintiff incorporates and realleges above paragraphs of this complaint as if the same has been set forth again here in.

125.     Under Title VII, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person

126.     Defendants, One Three Five Inc., and Albert Bortz are both employers of the Plaintiff.

127.    Title VII prohibits not only intentional discrimination, but also practices that have the effect of discriminating against individuals because of their race, color, national origin, religion, or sex.

128.    The Equal Pay Act ("EPA") prohibits discrimination on the basis of sex in the payment of wages or benefits, where men and women perform work of similar skill, effort, and responsibility for the same employer under similar working conditions.

129.    The EPA covers all employers who are covered by the Federal Wage and Hour Law (the Fair Labor Standards Act).

130.    On June 24, 2013, the United State Supreme Court held, in *Vance v Ball State University*, that an employee is a supervisor for purposes of vicarious liability for unlawful harassment under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim.

131.    Under Title VII, a "hostile work environment" is one which is "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive as to alter the Plaintiff's employment and create an abusive working environment."

132.    Federal district courts and appellate courts have held that the claim of "hostile work environment" is available to ADA claimants, as it is to plaintiffs under Title VII of the Civil Rights Act of 1964. *Keever v. City of Middletown* (U.S. 6th Cir.) (citations omitted)

133.    To demonstrate a hostile work environment claim, a plaintiff must show that she was subjected to conduct that unreasonably interfered with her work performance or created an intimidating, hostile, or offensive work environment. The employer must be shown to have

engaged in "harassment so severe or pervasive as to alter the conditions of employment and create an abusive working environment."

134.    The court, in determining whether a working environment is hostile will examine the frequency and severity of the alleged discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.

135.    During the course of the Plaintiff's employment, she was subjected to sexually derogatory comments by employees of the Defendants and under the supervision of Defendants, One Three Five Inc., and Albert Bortz. Plaintiff had reported these incidents to management of One Three Five. Inc., on multiple occasions. Some of these comments were also made about the Plaintiff by the Defendants' general manager.

136.    To establish a Title VII claim for a violation of the Civil Rights Act of 1964 for harassment and hostile work environment the Plaintiff must allege the following elements (1) the plaintiff was subjected to [slurs, insults, jokes, or other verbal comments or physical conduct of a sexual nature[ sexual advances, requests for sexual conduct, or other verbal  or physical conduct of a sexual nature] [ conduct affecting other Title VII protected characteristics] (2) the conduct was unwelcome (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a sexually  or other Title VII protected characteristic abusive or hostile work environment (4) the plaintiff perceived the working environment to be abusive or hostile and (5) a reasonable person in the plaintiff's circumstances would consider the working environment to be abusive or hostile…The elements of this instruction are derived from *Fuller v. City of Oakland, California,*

47 F.3d 1522,1527 (9th Cir. 1995). The language in the instruction regarding the factors used to determine whether a working environment was sufficiently hostile or abusive is derived from *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

137.    The Plaintiff was also harassed and called names, such as "schizophrenic" after she was hospitalized by an employee while working for the Defendants regarding her disability, and was also called named by the Defendants' general manager to other employees, who also would harass and talk about the Plaintiff infront of customers. The general manager would also discuss the Plaintiff's employment with other individuals.

138.    Sabrina Bortz would also talk with the Plaintiff to let her know that employees were "messing" with her and pranking her after she returned to work after her hospitalization in November, 2015.

139.    The courts have even also recognized pranks to be a battery tort.

140.    In addition to establishing a hostile work environment claim, to state a prima facie case for discrimination under Title VII Plaintiff must allege the following elements (1) the employee is in a protected class (2) the employee was qualified for the position (3) the employee was rejected for the position, or the employee was fired (4) an employee outside of the protected class was selected for the position, or the employer continued to look for candidates

141.    The Defendants' general manager who had later fired the Plaintiff in February, 2016, due to her disability after being harassed and pranked at work because of the disability and her hospitalization due to the disability, had hired back a dancer a week after firing the

Plaintiff, who was involved in numerous incidents that occurred against the Plaintiff, including incidents of battery, sexual harassment and defamation. ( ¶¶ 40-42,52).

142.   Additionally, in "disparate treatment" or "overt discrimination" cases, a plaintiff must generally prove three things at the outset by a fair preponderance of the credible evidence:

  (1)  that the plaintiff falls within a protected category

  (2)  that the defendant's actions were directed at the plaintiff;

  (3)  that the defendant's actions discriminated, restricted, or made a distinction as to
       plaintiff by virtue of their membership in the protected category.

In doing so, a plaintiff must plead and prove that the defendant made statements to or took actions to or about the plaintiff of such a nature that a reasonable mind might conclude discrimination. *Katz v. Massachusetts Commission Against Discrimination*, 365 Mass. 357,312 N.E.2d 182(1974)

143.   In addition to the disparate treatment due to the Plaintiff's disability, the general manager had also used other forms of disparate treatment against the Plaintiff during her employment at Blush. He would discuss the Plaintiff's employment with customers on an ongoing occurrence and additionally after the Plaintiff had reported that she was severely verbally sexually harassed by two dancers one evening after being suspended for a week for calling off work, the general manager ended up suspending the Plaintiff for six months in March 2015. The dancers had accused the Plaintiff of sexual acts with individuals that was not true., had sent messages to the Plaintiff on social media regarding this, and had also told the Plaintiff during her suspension that she was never getting her job back. The Plaintiff was

only supposed to be suspended for a week for calling off, but was suspended for six months and then returned to work in August 2015. (¶¶ 37-39).

144.    Another form of disparate treatment and discrimination is while the Plaintiff was at Blush suffering from a mental impairment prior to her being hospitalized in November 2015, she had asked for the police and the owner of the club to be called. The Plaintiff had just worked the evening prior when she had informed the general manager that she started not to feel well. Instead of calling for any type of assistance for the Plaintiff, the general manager discriminated against the Plaintiff believing that she was on drugs, and had forced her to leave with a male individual who was a former employee. The severity of the Plaintiff's condition was very recognizable, and the general manager even made reference about her pupils being extremely dilated. The Plaintiff had informed him that she did not want to leave with him and his friend who she did not know. In the vehicle after first leaving the club, the Plaintiff had to keep pushing this individual away from her after he kept trying to kiss her. The Plaintiff then had a severe neurological and physical motor impairment that developed during this time in addition to developing audible and visual hallucinations and was mentally and sexually taken advantage of by this individual.  The Plaintiff then spent 12 days in Western Psychiatric Hospital, while also complaining of sexual abuse in a severely disabled mental state.

145.    Plaintiff was given a drug test while at the hospital, which came back negative for all drugs tested. Plaintiff signed a release of this information to Defendant, Albert Bortz and his wife.

146.    When the Plaintiff returned to work, Albert had required that the Plaintiff seek

treatment from her therapist and sign a release of records to them.

147.    Plaintiff was subject to many different forms of harassment during her employment,

some of which were on the basis of different forms of hate crimes and on the basis of her

disability impairment in addition to sexual harassment.

148.    The harassment described in this complaint had a substantial detrimental effect on

the Plaintiff's employment and psychological well-being. This included harassment prior to and

after Plaintiff's hospitalization in November 2015.

149.    The Plaintiff did not encourage, welcome, or consent to any of the harassment

described.

150.    Lastly, an action brought by an individual against a private club or association for

discrimination will necessarily be brought under a state or federal anti-discrimination and/or

public accommodations statute.

151.    42 U.S.C.A.§2000a specifically prohibits discrimination in places of public

accommodations, protecting all persons' entitlement" …to the full and equal enjoyment of

the goods, services, facilities, privileges, advantages, and accommodations of any place of

public accommodation, as defined in this section, without discrimination or segregations on

the grounds of race, color, religion, or national origin. See subsec. (a)

152.    The Plaintiff has also shown that she was prohibited from being on the premises of

the club after being fired due to the disability.

153.    The Plaintiff has alleged facts to show multiple causes to state a claim under Title VII

of the Civil Rights Act of 1964 as a result of the Defendants' conduct.

36

154.     The Plaintiff sustained emotional suffering, a tangible economic detriment, financial losses, and other injury.

155.     The Plaintiff is entitled to compensatory damages, punitive damages, back pay and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF- VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, QUID PRO QUO SEXUAL HARASSMENT

156.     Plaintiff incorporates and realleges above paragraphs of this complaint as if the same has been set forth herein.

157.     Plaintiff is a woman and as such is a member of a group protected under Title VII from discrimination on the basis of sex.

158.     The dancers of Blush are required by the Defendants to perform all nude on separate stages throughout the evening. The dancers performing on stage is the main attraction of the Defendants' business that provides the entertainment to it's customers. The dancers are not paid anything for these required performances.

159.     The dancers are also required to work a set number of shifts per week and hours per day by the Defendants. The dancers are required to stay until the end of their shift. The dancers are not paid anything by the Defendants for working their shifts, instead the dancers own their own profits, which they are required to share with the Defendants for providing nude and private dancers. The prices that the dancers are required to charge the customers and pay the Defendants is also set by the Defendant, Albert Bortz.

160.    The dancers, the Plaintiff, were required to pay these profits in addition to being
unlawfully charged 10% by the Defendants on all income earned by their credit card
earnings.

161.    The Defendant, Albert Bortz, improperly suggests and classifies that the dancers are
independent contractors to save on labor costs, taxes and other business expensive of a W2
employee, while requiring the dancers to still work as employees as nude dancers for his
establishment, while profiting unlawfully from their gratuities in addition to making them
pay required house fees.

162.    The dancers are also required to perform fully nude for the third song during their
performances, and the DJ will publically notify them infront of customers to make sure they
are fully nude. The dancers are subject not only to being suspended or fined for refusing to
be fully nude, but can also be fired and sent home for not performing on stage or for being
late to their stage sets.

163.    42 U.S.C.A.§2000e (section 703) states that it shall be unlawful for an employer to
limit, segregate, or classify his employees or applicants for employment in any way which
would deprive or tend to deprive any individual of employment opportunities or otherwise
adversely affect his status as an employee, because of such individual's race, color, religion,
sex, or national origin.

164.    Defendants' business practice is entirely on the use and exploitation of the dancers in
order for the company and its owners to earn a profit.

165.    The dancers in this type of industry can be the most vulnerable in subjecting
themselves to follow unlawful employment practices and rules under someone else's control,

because of the power that these types of club owners, Defendants, have over their economic security. So therefore, the dancers in most cases are not aware of their basic workplace rights in this type of industry.

166.     As a result of the Defendants' requirement for the dancers to work schedule shifts without pay, pay excess fees and fines to work at the establishment, pay a portion of the profits earned to Defendants, unlawfully pay portions of their gratuities, dance on stages as part of the clubs entertainment throughout the evening, be denied basic workplace rights and still be required to work as an employee instead of an independent contract or be subjected to termination and loss of employment, the dancers suffer from a number of emotional and financial damages by having to accept this.

167.     In this type of industry there are already certain losses that some of these dancers accept emotionally or how one may be viewed socially in today's society. So for the Plaintiff to have dedicated years of her life working for the Defendants and having to be denied basic workplace rights, it is not right for the Defendants to unlawfully further subject the Plaintiff to damages by violating her other Federally protected rights.

168.     For these reasons and the reasons alleged above the Plaintiff has suffered from damages as a result of the Defendants' conduct.

## EIGHTH CLAIM FOR WRONGFUL DISCHARGE FROM EMPLOYMENT IN BREACH OF CONTRACT

169.     The Plaintiff incorporates and realleges above paragraphs of this complaint as if the same has been set forth again herein.

170.     This claim is not based upon a written contract, it based upon different verbal agreements that occurred between the Plaintiff and the Defendant, Albert Bortz during her employment at Blush, that the Defendants did not follow through with.

171.     A false promise concerning the terms or duration of employment may give rise to an action for breach of contract if the plaintiff can establish the elements of a binding contract incorporating the promise and a beach of the contract by the defendant. See *Price v. Highland Community Bank*, 932 F.2d 601 (7th Cir.1991) (applying Illinois law; failure to keep oral promise, made in negotiations for plaintiff's hiring, to establish incentive compensation program for plaintiff constituted breach of contract) *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 117 Lab. Cas. (CCH) P56459 (3d Cir. 1990) (applying Pennsylvania law; even though written contract was never executed, evidence showed that agreements made in hiring plaintiff constituted oral contract with terms defined by written contract)

172.     The Plaintiff and Defendants entered into a verbal employment agreement under which the Plaintiff agreed to be employed as a dancer and work for the Defendants and agreed to work a set scheduled shift and set number of days for the Defendants.

173.     The Defendant, Albert Bortz upon Plaintiff's initial hiring in the industry as a dancer in 2005, verbally assured she would have job security in working for him.

174.     The Plaintiff was also told by the Defendant, Albert Bortz, in 2014, that as long as she showed record of completion of her impatient program and signed a release of authorization to them to speak with the facility of her outpatient program, and provided copies of her drug tests from the facility to the Defendants that she could continue her employment at Blush. He also informed her that she would do really well at the club again,

and they talked about what plans she might have to invest in the future on the money that

she would make from dancing. He also informed her that she would be able to dance and

work for the Defendants until she had decided she wanted to retire from the industry.

175.    The Plaintiff was also required to sign a release of information to provide her drug

test results and so that the Defendants could speak with the hospital during her

hospitalization after the Defendants had requested in November 2015.

176.    The Plaintiff had returned to work after her hospitalization in November 2015, where

she was required by Defendant, Albert Bortz to make sure to follow up with treatment with

the therapists and psychiatrist's office in order to continue her employment there.

Additionally, he required that she sign a release of authorization from the psychiatrist's office

to give him and his wife permission to obtain records and to speak with the office in order

for her to keep her employment there. This is after the Plaintiff informed him that she had

already signed records from the hospital to prove that she was not on drugs during the

incident where his wife had visited her in the hospital.

177.    Federal law and the Americans with Disabilities Act states that:

> No covered entity shall discriminate against a qualified individual with a disability
> because of a disability of such individual in regard to job application procedures, the
> hiring, advancement, or discharge of employees, employee compensation, job
> training, and other terms, conditions, and privileges of employment. 42 USCA §
> 12112 (a) and
>
> A covered entity may not participate in a contractual or other arrangement or
> relationship that has the effect of subjecting a covered entity's qualified applicant or
> employee with a disability to prohibited discrimination. 42 USCA § 12112(b)(2)

178.    The Plaintiff agreed to sign a release of this information, which was a product of
duress for the fear of losing her employment if she did follow through with the requirement
of the Defendant, Albert Bortz.

179.    In a contract action, a particular contract is also invalid by law (called the "statute of
frauds") when the contract was a product of duress.

180.    On February 7, 2016, the Plaintiff was discharged from her employment at Blush by
the Defendants' general manager, because of her disability and because she was hospitalized
for the disability. About a week later this was confirmed that the Plaintiff was being
discharged due to these reasons and to her disability by the Defendant, Albert Bortz.

181.    When the Plaintiff tried to speak with the club in person in April 2016, regarding her
job and about the records she had signed for the Defendants, she was informed she was not
permitted to be on the premises of the club and had to leave.

182.    Plaintiff worked exclusively for Blush for indefinite periods of time. Plaintiff
anticipated that her employment with Blush would be on an ongoing basis.

183.    Defendants discharged Plaintiff from employment without following termination
procedures promised to Plaintiff and with discriminatory causes, thereby breaching the
contract of employment.

184.    As a result of the Defendants' wrongful discharge, the Plaintiff has lost earnings, has
incurred expenses and losses in seeking other employment.

185.    The Plaintiff is entitled to relief for lost earnings and any other incidental expenses
occurred while seeking employment.

186.      Also, in relation to the Plaintiff's FLSA claim, individuals who seek redress for

underpayment of wages are not limited to recover pursuant to FLSA or similar state statutes;

party may properly allege breach of contact in addition to statutory violation even when the

only difference between benefits provided by contract and those provided by statute is

limitations period applicable to claim based on conduct prohibited by both contract and

statute. 29 U.S.C.S. §§201 (15)

## NINTH CLAIM FOR RELIEF- FRAUD CLAIM BASED ON FALSE ASSURANCES REGARDING SECURITY

187.      Plaintiff incorporates and realleges above paragraphs of this complaint as if the same

has been set forth again herein.

188.      There are five fraud-based causes of action that may arise from a Defendants'

assurances as to security measures.

189.      This claim shows allegations for four of these causes of action, fraud, constructive

fraud, misrepresentation and statutes addressing deceptive practices or providing consumer

protection.

190.      An employee discharged in breach of contract may be able to bring a fraud action

based on the employer's promise of job security.

191.      In relation to breach of contract, fraudulent inducement claims are most frequently

based on alleged misrepresentations concerning the duration of employment, the terms of

compensation, or working conditions. Although most fraudulent inducement actions are

brought by employees in a traditional employer-employee relationship, essentially the same

action may sometimes be brought by an agent or independent contractor who allegedly has

been fraudulently induced to perform services he or she otherwise would not have performed. Actions for fraudulent inducement of employment are frequently based on a theory of actual fraud, fraudulent concealment or failure to disclose, or negligent misrepresentation. Finally, an employee who was fraudulently induced to perform services for an employer may be able to recover the amount by which the value of those services exceeded any compensation he or she was actually paid through a claim in equity based on quantum meruit or unjust enrichment. See *Goodell V. Rehrig Intern.,* (citations omitted)

192.     To establish a fraud claim, the Plaintiff must show that (1) the defendant made a false representation (2) of material fact (3) with knowledge of its falsity (4) and with intent to induce reliance (5) that did induce reliance on the Plaintiff (6) resulted in damage to the Plaintiff

193.     The first theory of fraud is that the Plaintiff was informed by the Defendants if she followed through with their requests of signing release forms and other medical records that she could continue employment with them and that the Plaintiff would be able to retire when she was ready to and the Plaintiff did sign these authorizations for fear of losing her job with Blush, and after the Plaintiff had signed a release of these records she was fired due to her disability.

194.     Another theory of fraud is the one mainly addressed in regard to the duration of Plaintiff's entire employment with Defendants since 2005. The Plaintiff was denied basic workplace rights and performed services for the Defendants by providing entertainment to their establishment as an employee with unpaid wages, had promoted for the Defendants without pay in addition to dancing, and had also paid the Defendants a required portion of

her gratuities earned over the years. The Defendants improperly classify and allege that the Defendants are independent contractors to save on ordinary business expenses, while requiring the dancers to pay house fees and late fees, but they are still being provided at the dancers' expense with the privilege of having the dancers as an employee rather than an independent contractor. The dancers are falsely led to believe that the Defendants have a right to also unlawfully collect 10% of all credit card gratuities earned, and the dancers are made to believe that the Defendants are not required to pay minimum wage if they are working the dancers on a scheduled shift as employees.

195.    Defendants were aware for over ten years that they were hiring and treating the Plaintiff as an employee, charging fines, house fees and illegally taking a portion of the Plaintiff's tips while paying no wages to the Plaintiff, having complete control of the Plaintiff's work and improperly claiming the Plaintiff as an independent contractor instead of an employee.

196.    Plaintiff was not aware of her basic workplace rights upon being hired by the Defendants, as most dancers are unaware when they begin in this industry.

197.    Alot of dancers began working for the Defendants at the age of 18, just as the Plaintiff had.

198.    A prior case was brought against the Defendant, One Three Five Inc., where the Defendant was found to be in violation of Federal and state wage laws and improperly classifying their dancers as independent contractors instead of employees *Correll v. One Three Five, Inc.* 2:13-cv-01610

199.     The Defendant, Albert Bortz, also had threatened all remaining dancers not part of the lawsuit that they would be fired for claiming their rights under the FLSA.

200.     These agreements between the dancers and Defendants to pay these fines, house fees and a portion of their tips and profits, are all agreements as a product of duress and under the "statute of frauds", because if the dancers did not agree to pay these fines and fees and work a set schedule for the Defendants without pay under their control, the dancers would not be permitted to work at the Defendants establishment.

201.     The Defendants hired the Plaintiff with the knowledge that they were violating these Federal and state wage laws, in addition to unlawfully requiring the Plaintiff to sign a release of her medical records in order to keep her employment Blush. Plaintiff was unaware that they were violating these laws when they hired her as an employee, and the Plaintiff also would not have signed her medical records if she knew they were going to fire her and discriminate against her because of the disability.

## FLSA CLAIMS FOR MINIMUM WAGE VIOLATIONS, STRAIGHT TIME COMPENSATION, OVERTIME PAY AND VIOLATIONS OF THE PMWA

202.     Plaintiff incorporates and realleges above paragraphs of this complaint as if the same has been set forth herein.

203.     Individuals who seek redress for underpayment of wages are not limited to recover pursuant to FLSA or similar state statutes; a party may properly allege breach of contract in addition to statutory violation even when only difference between benefits provided by contract and those provided by statute is limitations period applicable to claim based based on conduct prohibited by both contract and statute. 29 U.S.C.S. §§201 (15)

204.    At all times relevant to this lawsuit, Defendant, One Three Five Inc., is/was an eligible and covered employer under the FLSA pursuant to 29 U.S.C. § 203(d).

205.    At all times relevant to this lawsuit, Defendant, Albert Bortz, in his individual capacity is/was an eligible and covered employer under the FLSA pursuant to 29 U.S.C. § 203 (d).

206.    Notably courts that have determined that exotic dancers are employees have held both the dancer club and its individual owners liable for their violations of the FLSA and state labor laws. *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139,153 (D.D.C.2011) ("As the plaintiffs' employers, both Allen and The House are liable for violations of the FLSA and the District of Columbia wage laws.") see also *Mason v. Fantasy's Gentleman's Club* (D. Colo. July 27, 2015) (as the plaintiffs' employers, both Eardley and the corporation were held liable)

207.    "To be personally liable as an `employer,' a corporate officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." (citation and internal quotation marks omitted); *Ventura*, 738 F.Supp.2d at 5-6 (granting summary judgment on plaintiffs' claim that restaurateur was employer under the FLSA).

208.    The Defendants raise an issue in a motion to dismiss that was filed by the Defendants on December 27, 2017., alleging that the Plaintiff willingly and knowingly signed a waiver that she would be an independent contractor. *see* (ECF No.4) at VI.

209.     The Plaintiff is unfamiliar with and does not recall the signing of a waiver, but alleges

that even if there were a waiver that was signed, the waiver would be considered legally

invalid and this defense would also be insufficient for other reasons.

210.     First, the Plaintiff alleges that the Defendants would be in violation of the validity of

the waiver, because the Plaintiff still worked as and was treated as an employee instead of an

independent contractor.

211.     There are also many instances in which a signed waiver would be invalid, and one of

them is if the waiver violates any Federal or state laws. Since the Defendants are violating

Federal and state laws in addition to the gross negligence of not following these laws, it

would be one reason to make any waiver that was signed invalid.

212.     Another way for a waiver to be potentially rendered invalid is content, for a liability

waiver to protect certain parties, all of those parties must be mentioned by name. A party

who is not mentioned in the waiver but had a hand in contributing to a claim can be liable.

213.     Other ways that a waiver could be potentially rendered invalid are language and

wording of the waiver, format and location of critical language, misrepresentation, and gross

negligence and recklessness in addition to others.

214.     As stated above, since the Plaintiff is unfamiliar with the waiver that the Defendants

allege was signed, there is no way to specifically address the validity of the waiver at this

time, and the Defendants will have to submit this waiver during discovery.

215.     "Neither the common law concepts of 'employee' and 'independent contractor' nor

contractual provisions purporting to describe the relationship are determinative of

employment status." *Mathis v Hous. Auth. Of Umatilla Cnty.*, 242 F. Supp. 2d 777, 783 (D. Or. 2002) quoting *Nash v. Res., Inc.*, 982 F. Supp. 1427, 1433 (D. Or. 1997).

216.    Rather, to determine employment status under the FLSA's broad remedial purpose, courts across the nation apply some variant of the "economic realities test." The Plaintiff shows two different variations of this test below.

217.    The presence of any individual factor is not dispositive of whether an employee/employer relationship exists. Such a determination depends "upon the circumstances of the whole activity."

218.    The totality of the circumstances surrounding the relationship between the Defendants and their exotic dancer employees establish economic dependence by the the exotic dancers on the Defendants, and thus employee status. As a matter of economic reality, the Plaintiff and dancers are not in business for themselves but rather are economically dependent on finding employment through Blush. Their work is the basis of the Defendants' business.

219.    Defendants improperly classified its dancers as independent contractors and required its dancers to pay Defendant in order to work at Defendants' establishment. Defendants also require the dancers and the Plaintiff to pay house fees and tip outs in addition to paying them from a portion of the earnings of the private dances and champagne rooms.

220.    This was also in addition to taking 10 % of the tips that the dancers earned from credit cards, which is by law illegal for an employer to withhold any tip earnings even if they were paid with a credit card. According to the Department of Labor's Regulations, "tips are the property of the employee whether or not the employer has taken a tip credit under

section 3(m) of the FLSA." 29 C.F.R. § 531.52. Defendants unlawfully retained a portion of tips dancers received from Defendants' customers.

221.    In addition to these fees and profits paid to the Defendants, the dancers were required to make a weekly schedule, work a set number of shifts, work a set amount of hours per shift, follow rules under the supervision of management, pay late fees, and were required to be on the floor for their shift and dance on stage multiple times throughout the evening as part of the club's entertainment without pay. So therefore, in addition to paying the Defendants to work there and giving a portion of their earnings to the Defendants, they were additionally working scheduled shifts for the Defendant and generating revenue for the Defendant without pay. So this allegation shows a violation under the Fair Labor Standards Act. The Defendants deny their dancers basic workplace rights.

222.    The FLSA requires every "employer" to pay "each of his employees" a minimum wage. 29 U.S.C. § 206(a). The amount of the minimum wage under the FLSA has ranged from$5.15 to $7.25 for the time period between 2005 and 2016 while the Plaintiff was employed by the Defendants.

223.    Defendants denied basic workplace rights to the Plaintiff and required the Plaintiff to work as an employee without paying her minimum wage, while instead requiring her to pay house fees and share a portion of her earnings.

224.    The dancers are employees who remain economically dependent and under complete control and direction of Defendant, Albert Bortz and Blush, but are paid no wages in connection with their work. The dancers are required to dance on stage multiple times throughout the evening as part of the entertainment provided to the Defendants' customers.

The dancers are the product that the club sells and promotes to its customers. The dancers generate the primary revenue for defendants and their work is the basis of Defendants' business. The amount of control that Albert Bortz and Blush have over the dancers and their work that is performed is actually much more than an average employer to the extent of requiring a certain amount of makeup the dancers are required to wear and the types of gowns the dancers must purchase during their scheduled shifts to wear at the club. The dancers are required to work a scheduled shift set by Albert Bortz, and are required to work a certain amount of hours for each shift. The dancers are also required to be on the floor working and talking to customers during their shifts unless they are getting ready in the dressing room.

225.     Several other federal courts that have been presented with the question of whether exotic dancers are employees under the FLSA or independent contractors have found the dancers to be employees. See *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324 (5th Cir.1993) (upholding district court's determination that exotic dancers were "employees" under FLSA following *148• bench trial); Morse v. Mer Corp., No. 1:08-cv-1389, 2010 WL 2346334 (S.D.Ind. 2010) (granting summary judgment that exotic dancers were "employees" under FLSA); *Reich v. Priba Corp.*, 890 F. Supp. 586 (N.D.Tex.1995) (finding exotic dancers to be "employees" under FLSA).  These are some cases in addition to numerous other cases where the dancers were found to be employees under the FLSA instead of independent contractors

226.     The Defendant, One Three Five Inc., was already found to have violated laws of the FLSA and PMWA by the district court for these same laws that they did and still continue to

51

violate. *Correll v One Three Five Inc.* (citation omitted) The foregoing conduct, as alleged,

constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 216(b).

227.      As a threshold matter, FLSA plaintiffs must prove that an employment relationship

existed with the defendant. *Reich v. ConAgra, Inc.,* 987 F.2d 1357,

**Economic Realities Test**

228.      The following is a dominant test that is used in determining whether a given

relationship is employment or independent contractorship. This test emphasizes the extent

of control exercised over the performance of work, and is often called the "control test." An

often-quoted formulation of this test appears in section 220 of the RESTATEMENT

(SECOND) OF AGENCY:

In determining whether one acting for another is a servant or an independent contractor, the

following matters of fact, among others, are considered:

(a)      the extent of control which, by the agreement, the master may exercise over the
details of the work;
(b)      whether or not the one employed is engaged in a distinct occupation or business;
(c)      the kind of occupation, with reference to whether, in locality, the work is usually
done under the direction of the employer or by a specialist without supervision;
(d)      the skill required in the particular occupation;
(e)      whether the employer or the workman supplies the instrumentalities, tools, and the
place of work for the person doing the work;
(f)      the length of time for which the person is employed;
(g)      the method of payment, whether by time or by the job;
(h)      whether or not the work is a part of the regular business of the employer;
(i)      whether or not the parties believe they are creating the relation of master and servant;
(j)      whether the principal is or is not in business

Courts differ about how heavily to weigh particular factors. The most "traditional" approach
is one that attaches primary importance to the first factor listed in the RESTATEMENT:
control over the details of the performance, emphasizing the right to give particularized
orders or directions. See *Jones v. Atteberry*, 77 Ill.App.3d 463, 33 Ill.Dec.28, 396 N.E.2d

104(Ill.App.1979). During recent decades there has been a constant trend paying greater attention to the "economic realities" of the situation. Another test that is used is the "relative nature of the work test", this test emphasizes factors (b) and (h) in the RESTATEMENT version of the control test, asking whether the worker has in fact become an integral part of the employer's business.

229.    The Plaintiff sets forth the factors from the test above to show that she was an

employee of the Defendants and during her employment did not work as an independent

contractor:

(a)  the Defendants, One Three Five Inc., and Albert Bortz had complete control over the details of the Plaintiff's work, including the fees she was required to charge for the services the club offered, outfits she was required to wear, amount of hours she was required to work per shift, amount of days she required to schedule and work, times when she was required to dance on stage throughout the evening, including fully nude stage sets, how much she was required to pay the club from the profits she earned in the club, amount of late fees and tip outs she was required to pay,  the amount of time she was required to sell the champagne rooms for in addition to other details
(b)  the Plaintiff worked in a distinct occupation as an exotic dancer in a gentleman's club
(c)  in most cases, such as this one, this type of occupation as an exotic dancer while working in a gentleman's club is done under the direction of an employer and management supervision
(d)  the skill required for this occupation varies from amateur dancers auditioning for employment for the Defendants to very experienced and skilled dancers
(e)  the employer supplies the place of work, the stages, the champagne rooms, lap dance rooms and dressing room which are all instrumentalities in the Plaintiff's work
(f)  the Plaintiff has been an employee of the Defendants for over ten years
(g)  the method of payment is cash or blush money that is paid directly from the customer to the club and the club would give the Plaintiff a portion of her earnings. Some of the services that the club offered were by time such as a 30 minute or 60 minute champagne room, and some of the services were per dance. Additionally, the shifts where the Plaintiff was required to be on the floor and dance on stage multiple times through out the evening were hourly shifts where the Plaintiff was required to work 6-7 hour shifts and was not paid for these shifts.
(h)  the work is the primary business of the employer
(i)  the Defendants create a well known relation with their dancers to show the relation of employer/employee
(j)  the principal is in business

230.　　The Plaintiff not only shows the given relationship and extent of control to the most important factors considered in the test above, but the Plaintiff asserts an employer relationship in <u>all</u> of the factors that are referred to in the test. However, to determine an individual's employment status under the FLSA, courts only apply an "economic reality" test that considers various factors, such as: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship and (5) the extent to which the work is an integral part of the employer's business." *Morrison*, 253 F.3d at 11. "No one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence." Id. "The final and determinative question must be whether the totality of the circumstances considered establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." Id. (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir.1976)).

231.　　To state a claim under the FLSA the plaintiff must allege the following elements: (1) plaintiff was employed by defendant during the relevant period (2) plaintiff was engaged in commerce or employed by an enterprise engaged in commerce or the production of goods for commerce that had annual gross sales of at least $500,000 and (3) the defendant failed to pay plaintiff minimum wage and/or overtime pay…the Plaintiff has done so.

Source: 8th Cir. Model Civ. Jury Instr. §10.01 (2011)

232.     At all relevant times the Defendants knew and recklessly disregarded that the FLSA and Pennsylvania Labor Code applied to the Plaintiff and that under the economic realities test, the Plaintiff was obviously an employee, not an independent contractor, entitled to minimum wage.

233.     At all relevant times, the Defendants knew and recklessly disregarded that the Plaintiffs was a tipped employee.

234.     At all relevant times, Defendants knew and recklessly disregarded that the dances and room fees were tips, not wages.

235.     At all times relevant the Defendants knew and recklessly disregarded that they were improperly retaining a portion of the Plaintiff's tips and that they required the Plaintiff to pay the Defendants in cash for each shift work

236.     The Third Circuit has not considered the level of detail necessary to plead a PMWA claim, but it has considered the level of detail necessary to plead similar overtime claims under the FLSA. *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236,241 (3d Cir.2014). Because the PMWA "substantially parallels" the FLSA, this Court should look to the federal courts' interpretation of the FLSA when analyzing claims under the PMWA. See Ford-Greene, 106 F. Supp. 3d at 610-13 (applying Third Circuit's analysis in Davis to the plaintiff's claims under both the FLSA and PMWA. The Plaintiff's allegations that state a claim for relief under the FLSA also give rise to a plausible claim for relief under the PMWA.

237.     Due to Defendants FLSA and state law violations, Plaintiff is entitled to recover from the Defendant, compensation for unpaid wages; an additional equal amount as liquidated damages; attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

## CLAIM FOR RELIEF-UNJUST ENRICHMENT

238.     Plaintiff incorporates and realleges above paragraphs of this complaint as if the same

has been set forth again herein.

239.     The Defendants recognize by acknowledging in their motion to dismiss, *see* (ECF No.

4) at VII, that under Pennsylvania law, "to sustain a claim of unjust enrichment, a claimant

must show that the party against whom recovery is sought either wrongfully secured or

passively received a benefit that it would be unconscionable for her to retain." *Torchia v.*

*Torchia*, 346 Pa. Super. 229,499 A.2d 581, 582 (1985).

240.     The Defendants violated Federal and State labor laws while unlawfully retaining a

portion of the Plaintiff's earnings in addition to imposing fines and house fees. Also, the

Defendants unlawfully retained a portion of the tips that the Plaintiff earned.

241.     The Plaintiff was not paid anything by Defendants for the services that she rendered

or anything in relation to her work for the Defendants, and the Defendants did not pay the

Plaintiff any wages for the hours worked during her shifts while employed for the

Defendants.

242.     The Plaintiff's earnings were solely earned herself on the dances and private rooms

that she sold in addition to her own tips that she earned. The Plaintiff's allegations show that

the Defendants wrongfully secured benefits and earnings of the Plaintiff while avoiding

other labor costs for other employees by imposing tips out from the dancers.

243.     Additionally, by unlawfully alleging that the dancers are independent contractors the

Defendants are saving on wages, taxes, insurance, benefits, and other costs associated with a

W2 employee, while still charging the dancers house fees that an independent contractor

would pay, but still requiring the dancers to make a schedule and work as an employee under the full supervision of defendants and their rules while also taking a portion of the profits from their services.

244.     These allegations show that the Defendants unlawfully and wrongfully secured a benefit, but that is also excessive and not right.

245.     An employee who was fraudulently induced to perform services for an employer may be able to recover the amount by which the value of those services exceeded any compensation he or she was actually paid through a claim in equity based on quantum meruit or unjust enrichment. *see Goodell V. Rehrig Intern., Inc.,* 683 F. Supp. 1051 (E.D. Va. 1988).

246.     The Plaintiff does not assert that she deserved to be compensated more or that her compensation was illegal, the Plaintiff strongly contends that she was not compensated anything by the Defendants, in fact they unlawfully retained gratuities of the Plaintiff. The Plaintiff asserts that her compensation was earned herself from tips she earned and other services rendered for lap dances and champagne rooms and she was not compensated anything by the Defendants while working under their strict control and direction of the employment and earning revenue for them.

247.     Under Pennsylvania law, a claim of unjust enrichment must allege the following elements (1) plaintiff conferred a benefit on the defendant (2) the defendant appreciated the benefit and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit

248.     The assertion from the defendants' motion to dismiss that the Plaintiff and

Defendants had an agreement that stipulated how the Plaintiff was to be compensated is

irrelevant, the Plaintiff was not compensated anything by the Defendants.

249.     "The polestar of the unjust enrichment inquiry is whether the defendant has been

*unjustly* enriched; the intent of the parties is irrelevant." *Limbach v. City of Philadelphia*, 905

A.2d 567,577 (Pa. Commw. 2006).

250.     It is black letter law that tips received by an employee are the employee's tips an an

employer has no ownership interest in said tips. The Department of Labor's Regulations

state, "tips are the property of the employee whether or not the employer has taken a tip

credit under section 3(m) of the FLSA." 29 C.F.R. § 531.52.

251.     The Plaintiff asserts the following to support the elements in her claim for unjust

enrichment that (1) the Plaintiff paid the Defendants a portion of her earnings for the

services rendered at the club, and Defendant sets the fees that the Dancers may charge a

customer for the private performances; the Plaintiff paid required tips outs to some of the

Defendant's employees which covered the expenses and cut costs for the Defendants having

to pay extra for employees; Plaintiff paid Defendants a portion of all of her credit card tips

and earnings; Plaintiff paid defendants house fees, late fees and fines; Plaintiff also worked a

required schedule for the Defendants under their complete control without being paid

minimum wage or any compensation during those shifts; Plaintiff had to purchase her own

work attire that was required to wear by the Defendants, and they did not pay anything for

these outfits, actually the Defendants make a profit off of these required outfits that they sell

to the dancers in their store; (2) without the employment of the dancers, the Defendants

would generate no revenue and would not be in business; the Defendants have a willful policy and practice of having the Plaintiff and dancers lower their business expenses by requiring dancers to tip certain individuals a required minimum amount to reduce its labor costs to these other employees; the Defendants unlawfully retain a portion of the dancers tips from credit cards after charging the customers a fee for the credit card transactions; the Defendants also set the fees for the services they offer in the club and retain a portion of the dancers earnings from these services; Defendants set the price of the houses fees, late fees and fines that the Dancers pay; Defendants save on labor costs, taxes, insurance and other business expense of a W2 employer by claiming the dancers are independent contractors but unlawfully still treating them as an employee; (3) the portion of the dancers earnings that the Defendants keep making it inequitable because the Dancers are paying unnecessary fees in providing these services, while the Defendants are taking half of the profits earned while contributing none of these expense that the dancers pay, actually they are charging the dancers in addition to keeping a portion of their earnings; the fact that the Defendants charge the customers for credit card transactions and unlawfully take 10 % of all credit card earnings from the dancers unlawfully make it inequitable; by the Defendants saving labor costs and other ordinary business expenses by imposing other fees and required tip outs on the dancers make it inequitable; by claiming the dancers are independent contractors but still having them work required shifts as an employee under their control without paying them minimum wage or any compensation make it inequitable and unlawful under Federal and State labor laws

252.     A corollary principle applies that "a person is not permitted to profit by his own wrong. Whether the defendant's conduct is "wrongful" will ordinarily turn on principles outside the Restatement.

253.     Compared to the open-ended implications of the term 'unjust enrichment,' instances of unjustified enrichment are both predictable and objectively determined, because the question is not moral but legal.

254.     The Restatement provides a set of remedies other than compensatory damages for harm. They concentrate on what the defendant has received rather than what the Plaintiff has lost.

255.     The remedies cover money judgments and the measure of unjust enrichment focusing primarily on the defendant's gain rather than the claimant's loss. The remedy part explains how it draws important distinctions between innocent recipients and conscious wrongdoers.

256.      As a result of the Defendants' unjust enrichment, the Plaintiff is entitled to reimbursement, restitution and disgorgement from Defendants of the benefits conferred by the Plaintiff.

## NEGLIGENCE

257.     Plaintiff incorporates and realleges above paragraphs of this complaint as if the same has been set forth again herein.

258.     Plaintiff brings this cause of action for negligence, and a number of allegations in this complaint show different legal theories for negligence, and other torts in this complaint are a result from negligence as well as intentional malice.

259.     To bring a negligence claim, a plaintiff must only prove that the defendant owed a legal duty of care, breached that duty and therefore the Plaintiff suffered an injury.

260.     To state a claim against an owner or operator of a restaurant or tavern for negligent failure to protect against criminal assault a Plaintiff must allege the following elements (1) the defendant had a duty to exercise reasonable care to protect the plaintiff from criminal assault (2) the defendant breached that duty and (3) the defendant's negligence was a cause of the injuries suffered by the plaintiff in the assault

261.     The first element is to show that the defendant had a duty to exercise reasonable care to protect the plaintiff from criminal assault. If the plaintiff or the plaintiff's decedent was a patron at the defendant's establishment when the assault occurred, it usually will be possible to establish a duty on the basis of the "special relationship" that exists between the owner or operator of a restaurant or tavern and person on the premises *see St Phillips v O'Donnell* 137 Ill App3d 639, 92 Ill Dec 354,484 NE2d 1209 (1985). The RESTATEMENT SECOND OF TORTS recognizes certain duties that may be relevant to the plaintiff's attempt to show that the defendant was subject to a duty to exercise care to protect against criminal assault See §302 B [risk of intentional criminal conduct], §315 [duty based on "special relationship" between person with responsibility to protect and person to be protected].

262.     The Defendant was a current employee during the time of this incident and prior to entering the club, she was not terminated, suspended or prohibited from entering the club. The Plaintiff had just worked the evening prior to this incident.

263.     The Plaintiff is asserting that the Defendants had a duty to call the police for the Plaintiff or some other form of assistance, after she asked them to call the police or to call

for help, and with the condition that she was in. Additionally, she told them she was afraid and did not want to leave with the individual who is referred to in here and who is also a former employee of the Defendants.

264.      Instead, the general manager falsely accused her of being on drugs and first stated he would call the police and then changed his mind and made the individual physically take the Plaintiff off the premises. The fact that the Defendant is claiming that the Plaintiff was terminated prior to entering the club in their motion to dismiss is a completely false statement, because the Plaintiff just worked the evening prior to this incident when she informed the general manager that she started to not feel well. *See* (ECF No. 4) at VIII.

265.      The owner or operator of a restaurant or tavern may have a duty to comply with a reasonable request to telephone the police to report an actual or threatened assault, or to make a telephone call so that some other person can call the police, even if the assault victim and the person making the request are not invitees and the assault is not occurring on the premises of the restaurant or tavern. If the defendant or the defendant's employees knew that an assault was imminent or was taking place, the plaintiff may be able to show that they were negligent in failing to intervene directly to stop the assault, or in failing to call the police see, e.g. *Nevin v. Carlasco* 139 Mont 512,365 P2d 637 (1961)

266.      Negligence in failing to intervene to stop an assault or call the police may be particularly obvious where the person who was being assaulted, or some other person, requested help or requested that the police be called, and the request was refused or ignored. *see Schneider v. Pinnt* 173 Colo 232, 476 P2d 1004 (1970). See also LIABILITY OF OTHERWISE UNINVOLVED PERSON FOR HARM RESULTING FROM REFUSAL

TO TELEPHONE OR TO ALLOW ANOTHER TO TELEPHONE FOR

EMERGENCY OR POLICE HELP 37 ALR 4th

267.      The foreseeability can be established in many ways, one is that it is possible to show

that the defendant's general manager should have known that an assault or an accident was

likely to occur refusing to call for help or the police due to the physical symptoms and the

behavior that the Plaintiff was showing. Additionally, the Plaintiff informed him that she did

not feel comfortable and did not want to leave with the individual who he made take the

Plaintiff out of the club, and who was also drinking at their establishment for hours. As far as

the element of foreseeability is concerned, it generally will be sufficient for the plaintiff to

show that it was foreseeable that an assault would be committed in some manner. The fact

that the assault was committed in an unexpected or unforeseeable manner does not make the

assault unforeseeable. *Yarbough v. Erway* 705 SW2d 198 (Tex App 1985) writ ref nre; The

plaintiff has established the first two elements already. Another way to establish the second

element for breach of duty instead of the refusal to call assistance or the police for the Plaintiff,

the Defendants also made the Plaintiff leave with the individual who had been drinking for

hours at their establishment. In order to establish negligence based on serving alcohol to a

person, the plaintiff may have to show that an assault was a foreseeable consequence of the

provision of alcohol and the person's resulting intoxication. see *Bishop v. Fair Lanes Bowling Inc*

623 FSupp 1195(ND Ga 1985)

268.      The last element the Plaintiff must allege is the defendant's negligence was a cause of

the injuries suffered by the plaintiff in the assault. If the general manager would have called

the police or called for some other assistance for the Plaintiff after she requested due to the

severity of the behavior she was showing and the physical symptoms such as her pupils that the general manager made a direct reference to by believing she was on drugs, the Plaintiff would not have suffered from multiple injuries and damages that progressed after being forced to leave the club. Additionally, if the general manager would not have forced the Plaintiff to leave with the individual referred to, she would have never been mentally taken advantage of, sexually assaulted, or endured the neurological damages that occurred from insomnia and the psychotic break, and lastly if the police or assistance would have been called at the time of the Plaintiff's request, it would have prevented her from spending almost two weeks in Western Psychiatric Hospital as a result from intentional and negligent acts.

269.    The plaintiff has established all of the elements with factual allegations in the Complaint to state a claim for negligence that is legally sufficient. The complaint also asserts that while bringing this cause of action for negligence, other torts in the Complaint are also a result from intentional and unintentional negligence.

270.    Another theory that the Plaintiff can state a claim for in a related or alternative negligence action, is a dram shop action. In order to establish the defendant's liability in an action under a dram shop statute, it generally will be necessary to show that the plaintiff was assaulted by a person to whom the defendant had served alcoholic beverages while the assailant was visibly intoxicated. *see.* e.g. *Norwood v. Marrocco* 586 F Supp 101 (D DC 1984)

271.    Another theory that the Plaintiff can state a claim under is for negligent failure in the retaining and supervision of an employee under Title VII of the Civil Rights Act of 1964 and other State law claims. Defendants and management were informed of harassment and discrimination that was an ongoing occurrence from their employees and management, and

64

no actions were taken by the Defendant to prevent it from occurring after the Complaints were made by the Plaintiff. The Plaintiff asserts one example, by showing that the Defendants informed the Plaintiff that they were aware that employees were "messing with her" after her hospitalization. Plaintiff informed Defendants of harassment that had occurred prior to and after the hospitalization in November 2015.

272.     Additionally, any violation under the ADA also constitutes an action for negligence.

273.     Due to the Defendants negligent actions, the Plaintiff is entitled to recover from damages resulting from the negligence.

### DAMAGES

The Plaintiff has suffered from a list of damages from economic losses, financial losses, losses of other employment, personal injuries, neurological issues, psychological distress, social losses, PTSD, depression, anxiety, pain and suffering among many other specific damages not listed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for relief in the following forms:

1.  A declaration that the Defendants have violated pertinent sections of the ADA and PA State law

2.  An award of pecuniary losses to Plaintiff

3.  An award of compensatory damages to Plaintiff, including back pay and compensation for mental suffering and other financial losses

4.  An award of punitive damages to the Plaintiff

5. Lost Earnings

6. Incidental expenses occurring while seeking other employment

7. A declatory judgment that the practices complained of herein are unlawful and under the FLSA and PMWA

8. An award of unpaid minimum and overtime wages to Plaintiff

9. Restitution of wages and gratuities improperly retained by the Plaintiff

10. An award of liquidated damages to the Plaintiff

11. An award of costs and expenses and any attorneys' fees that may apply

12. Any other relief to which the Plaintiff is justly entitled

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this complaint.

Dated: October 27, 2017                                    Respectfully submitted,

**ReJeana Silla**

Pro Se Litigant

430 Taylor St.
Pittsburgh, PA 15224
(412) 694-3806